CHIEF JUSTICE McGRATH
delivered the Opinion of the Court.
¶1 The Attorney General of Montana and the Commissioner of Political Practices appeal from the District Court’s Order on Cross-Motions for Summary Judgment filed October 18, 2010. We reverse.
PROCEDURAL AND FACTUAL BACKGROUND
¶2 Western Tradition Partnership (WTP), Champion Painting and Montana Shooting Sports Foundation (MSSF) sued the Montana Attorney General and the Commissioner of Political Practices seeking a declaration that § 13-35-227(1), MCA, violated their freedom of speech protected by the United States and Montana Constitutions by prohibiting political expenditures by corporations on behalf of or opposing candidates for public office. The parties filed cross-motions for summary judgment along with briefs and supporting materials. The District Court declared the statute unconstitutional, granted summary judgment for the plaintiffs and denied summary judgment to the State defendants. The District Court enjoined enforcement of the statute and denied the motion of Champion and MSSF for an award of attorney fees. The State appeals the order of summary judgment in favor of the plaintiffs, and Champion and MSSF cross-appeal from the denial of their request for attorney fees.
STANDARD OF REVIEW
¶3 This Court reviews a district court’s decision on summary judgment using the same standards as the district court under M. R. Civ. P. 56. Where there are cross- motions for summary judgment and *223 the district court is not called upon to resolve factual issues, but only to draw conclusions of law, we review to determine whether those conclusions are correct. Bud-Kal v. City of Kalispell, 2009 MT 93, ¶ 15, 350 Mont. 25, 204 P.3d 738. Accordingly, a moving party is entitled to summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Town & Country Foods v. City of Bozeman, 2009 MT 72, ¶ 12, 349 Mont. 453, 203 P.3d 1283. Statutes enjoy a presumption of constitutionality, and a decision on the constitutionality of a statute is subject to plenary review. City of Billings v. Albert, 2009 MT 63, ¶ 11, 349 Mont. 400, 203 P.3d 828.
DISCUSSION
¶4 Section 13-35-227, MCA, was originally enacted as an initiative by the Montana voters in 1912. It provides:
(1) A corporation may not make a contribution or an expenditure in connection with a candidate or a political committee that supports or opposes a candidate or a political party.
(2) A person, candidate or political committee may not accept or receive a corporate contribution described in subsection (1).
(3) This section does not prohibit the establishment or administration of a separate segregated fund to be used for making political contributions or expenditures if the fund consists only of voluntary contributions solicited from an individual who is a shareholder, employee or member of the corporation.
(4) A person who violates this section is subject to the civil penalty provisions of 13-37-128.
Section 13-37-128, MCA, provides the sanction for a violation of §13-35-227, MCA, and allows the Commissioner of Political Practices to recover a civil penalty up to $500 or triple the amount of the unlawful expenditure. A corporation may establish a separate segregated fund called a political committee or PAC to make political expenditures ‘if the fund consists of only voluntary contributions solicited from an individual who is a shareholder, employee, or member of the corporation. Section 13-35-227(3), MCA. Montana lawrequires that all political communications must include the name and address of the person or entity that paid for the communication. Section 13-35-225, MCA.
¶5 Champion Painting, Inc., is incorporated under the laws of Montana. It is a single proprietor painting and drywall business with *224 no employees or members, and its sole shareholder is Kenneth Champion. It is the only business corporation in this action. Mr. Champion is personally active in county and state politics, supporting and opposing candidates through blogs, letters to the editor, and speeches. Champion states that he wants to speak on political issues as a spokesman for his corporation and wants to spend corporation funds to independently support or oppose candidates. He believes that doing so would be prohibited by §13-35-227(1), MCA.
¶6 MSSA is a voluntary association of persons who support and promote firearm safety, shooting sports, education, shooting facilities and Second Amendment rights. It was incorporated in 1990 to provide liability shelter for its officers and directors. It has no employees or shareholders and its funding comes primarily from member dues and donations from other organizations. MSSA is led by its founder Gary Marbut, who is active in Montana politics on behalf of the Association. He and the MSSA have operated a political committee under Montana law for over ten years and publicize its grading and endorsements of political candidates in state and national elections. Marbut believes that the MSSA ‘has a political presence in Montana, and a political reputation that carries some weight with the Montana public by virtue of our long history of activism in Montana.”Nonetheless Marbut wants to use MSSA member dues to support or oppose candidates and believes that §13-35-227(1), MCA, prohibits MSSA from doing so.
¶7 Western Tradition Partnership is an entity incorporated in Colorado in 2008 and registered to do business in Montana. WTP reveals no more than that about itself in this case. Evidence presented by the State in District Court and not refuted by WTP is that its purpose is to act as a conduit of funds for persons and entities including corporations who want to spend money anonymously to influence Montana elections. WTP seeks to make unlimited expenditures in Montana elections from these anonymous funding sources. WTP’s operation is premised on the fact, or at least the assumption, that its independent expenditures have a determinative influence on the outcome of elections in Montana.
¶8 Upon the plaintiffs’ motion for summary judgment, the District Court considered whether § 13-35-227(1), MCA, violates the First Amendment to the United States Constitution to the extent that it restricts WTP, MSSA or Champion from making independent *225 corporate expenditures on behalf of candidates.[1] The District Court applied Citizens United v. F.E.C., 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010) and determined that § 13-35-227(1), MCA, impacts the corporations’ political speech protected by the United States Constitution. The District Court then considered whether the State had demonstrated a compelling interest for the restriction on speech, and whether the restriction is narrowly tailored to achieve that interest. While it answered both questions in the negative, the District Court did not conduct a detailed analysis of the compelling interest question. Instead, it concluded that “Citizens United is unequivocal: the government may not prohibit independent and indirect corporate expenditures on political speech.” (Quoting Minn. Chamber of Comm. v. Gaertner, 710 F. Supp. 2d 868 (D. Minn. 2010)). The District Court specifically did not address whether § 13-35-227, MCA, violated the Montana Constitution, and further noted that the decision had “no effect on direct corporate contributions to candidates or to any existing or future disclosure laws that might be enacted.” Those aspects of Montana law are therefore not at issue in this case.
¶9 We take note that Western Tradition appears to be engaged in a multi-front attack on both contribution restrictions and the transparency that accompanies campaign disclosure requirements. In addition to this case, it is currently engaged in separate litigation in the same District Court involving the Montana laws on campaign spending disclosures. Western Tradition Partnership v. Gallik, Cause BDV 2010-1120 (Mont. 1st Jud. Dist. Ct.).[2] In another action filed in United States District Court in September, 2011, WTP, under its new name of American Tradition Partnership, and with others, challenges the constitutionality of most of the limits and disclosure requirements contained in §13-37-216, MCA. Lair, et al., v. Gallik, et al., United States District Court for the District of Montana, Billings Division. Ironically, perhaps, WTP argued in the District Court and in its oral *226 presentation to this Court on appeal that their compliance with these same disclosure laws that it now seeks to invalidate should remedy any concerns regarding the potential corrupting influence of its unlimited corporate expenditures.
¶10 The District Court erroneously construed and applied the Citizens United case. That case considered the constitutionality of Federal statutes and regulations that prohibited corporations from “electioneering” (making a communication that refers to a clearly identified candidate for Federal office) within 30 days of a primary election or 60 days of a general election.
¶11 Citizens United was a case decided upon its facts, and involved “unique and complex” rules that affected 71 distinct entities and included separate rules for 33 different types of speech in Federal elections. Since 1975, the Federal Election Commission adopted 568 pages of regulations, 1,278 pages of explanatory materials, and 1,771 advisory opinions to implement and enforce the Federal law. The FEC adopted a two-part, 11-factor test in response to the holding in a single Supreme Court decision. If parties want to avoid litigation and possible penalties they must either refrain from political speech or seek an advisory opinion. All of this, the Supreme Court found, allows the FEC to “select what political speech is safe for public consumption by applying ambiguous tests.” Citizens United, 130 S. Ct. at 895-96. The Court determined that the law was “an outright ban, backed by criminal sanctions.” Citizens United, 130 S. Ct. at 897.
¶12 A premise of Citizens United was that First Amendment protections extend to corporations. Citizens United, 130 S. Ct. at 899. The Court additionally determined that the option for a corporation to spend through a separate PAC was not a sufficient alternative because of the burdensome, extensive, and expensive Federal regulations that applied. The Federal law allowed corporations to form a separate segregated fund (sometimes called a political action committee or PAC) as long as the funds were limited to donations from stockholders or, in the case of unions, its members. The Court found the regulations governing the organization of PACs to be “onerous” restrictions that might not allow a corporation to establish a PAC in time to make its views known in a current campaign. Citizens United, 130 S. Ct. at 898. Therefore, because the Federal laws and regulations severely restricted speech, their constitutionality could be maintained only upon a showing that they further a compelling governmental interest and are narrowly tailored to achieve that interest. Citizens United, 130 S. Ct. at 898.
*227 ¶13 The Court found that the Government did not claim that corporate expenditures had actually corrupted the political process and concluded that “independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption.” Citizens United, 130 S. Ct. at 909. However, if elected officials do succumb to improper influences from independent expenditures, “then surely there is cause for concern.” Citizens United, 130 S. Ct. at 911.
¶14 The Court determined that the government had not provided a compelling interest to justify the speech restrictions at issue. The Court considered and rejected arguments that preventing the distorting effect of large expenditures; preventing corruption or the appearance of corruption; or protection of dissenting shareholders were sufficient interests to support the Federal restrictions. Therefore, finding no compelling interest for the Federal restrictions on corporate political speech through independent expenditures, the Court found an impermissible contravention ofthe First Amendment. Citizens United, 130 S. Ct. at 911.
¶15 While Citizens United was decided under its facts or lack of facts,[3] it applied the long-standing rule that restrictions upon speech are not per se unlawful, but rather may be upheld if the government demonstrates a sufficiently strong interest. Citizens United, 130 S. Ct. at 898; Federal Election Comm. v. Mass. Citizens for Life, Inc., 479 U.S. 238, 251-52, 107 S. Ct. 616, 624 (1986); Bluman v. Federal Election Commission, 2011 U.S. Dist. LEXIS 86971 (D. D.C. 2011) (upholding Federal ban against campaign contributions by foreign citizens). The Supreme Court in Citizens United applied the highest level of scrutiny to the restrictions at issue there, requiring the government to demonstrate a compelling interest, although the level of evidence needed to satisfy heightened scrutiny will vary with the “novelty and plausibility of the justification raised.” Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 391, 120 S. Ct. 897, 906 (2000). Therefore, the factual record before a court is critical to determining the validity of a governmental provision restricting speech. The Dissents assert that Citizens United holds unequivocally that no sufficient government interest justifies limits on political speech. We disagree. The Supreme Court held that laws that burden political speech are subject to strict scrutiny, which requires the government to *228 prove that the law furthers a compelling state interest and is narrowly tailored to that interest. The Court, citing Wisconsin Right to Life v. FEC, 551 U.S. 449, 464, 127 S. Ct. 2652, 2663-64 (2007), clearly endorsed an analysis of restrictions on speech, placing the burden upon the government to establish a compelling interest. Citizens United, 130 S. Ct. at 898. Here the government met that burden.
¶16 In this case both sides moved the District Court for summary judgment. The WTP parties conducted no discovery in the case and presented two brief affidavits, one from the MSSF and one from Mr. Champion in support of summary judgment. The State presented a more extensive record consisting of the deposition transcripts of both Mr. Champion and Mr. Marbut of the MSSF, along with seven affidavits and attached exhibits. The plaintiffs did not contest any of this evidence. Nonetheless, the District Court failed to give adequate consideration to the record in determining whether the State had demonstrated a compelling interest for the restrictions imposed by § 13-35-227(1), MCA. We do so now because, unlike Citizens United, this case concerns Montana law, Montana elections and it arises from Montana history.
¶17 First, the depositions of Marbut (on behalf of MSSF) and Champion demonstrate that both have been very active politically in Montana on a range of issues that concern them. Neither could demonstrate any material way in which Montana law hindered or censored their political activity or speech. Mr. Marbut, on behalf of MSSF, has been an active fixture in Montana politics and in the legislative process for many years. He stated that he believed that while Montana law allowed MSSF to obtain and spend donations from other organizations on political activities, it did not allow MSSF to use dues paid by its members for the same purposes. No such distinction appears in Montana law, and the affidavit of the Commissioner of Political Practices affirms his construction of Montana law that it places no such restriction on MSSF. MSSF, therefore, failed to demonstrate that its speech was impaired by the statute.
¶18 Similarly, Mr. Champion described his many political activities both on a local and state level. He affirmed that he regularly speaks, blogs, and meets with others, and has run for public office. His complaint was that he believed that Montana law prohibits him from telling his audiences and readers that his company, Champion Painting, also supports his views. Mr. Champion believes that a candidate endorsement by 'Champion Painting, Inc.” would be more persuasive than his personal endorsement, and that if his business *229 spends money on political events he will enjoy ‘tax benefits.’’However, in Champion’s case he is the sole shareholder and derives his livelihood from the money he pays himself from the corporation. While the statute forbids the expenditure of Champion Painting’s corporate funds to support or oppose candidates, the burden upon Kenneth Champion, as a sole shareholder, to establish a political committee to advocate for his corporation’s interests and expend funds that he will decide to contribute, are particularly minimal. We conclude, under these facts, Champion’s political speech was similarly not materially impacted by the statute.
¶19 WTP, as noted, has been terse in its explanations of its organization, funding, activities, and intent. It claims to be a foreign corporation but it is not a business corporation. Its purpose, according to un-rebutted evidence submitted to the District Court by the State, is to solicit and anonymously spend the funds of other corporations, individuals and entities to influence the outcome of Montana elections. In a promotional presentation directed to potential donors, WTP represented:
There’s no limit to how much you can give. As you know, Montana has very strict limits on contributions to candidates, but there is no limit to how much you can give to this program. You can give whatever you’re comfortable with and make as big of an impact as you wish.
Finally, we’re not required to report the name or the amount of any contribution that we receive. So, if you decide to support this program, no politician, no bureaucrat, and no radical environmentalist will ever know you helped make this program possible. The only thing we plan on reporting is our success to contributors like you who can see the benefits of a program like this. You can just sit back on election night and see what a difference you’ve made.
Western Tradition Partnership, 2010 Election Year Program Executive Briefing. (Emphasis added.)
¶20 Organizations like WTP that act as conduits for anonymous spending by others represent a threat to the “political marketplace.” Mass. Citizens for Life, Inc., 479 U.S. at 264, 107 S. Ct. at 631. Echoing that theme, the State presented evidence that WTP has operated in disregard for and without complying with Montana law, unlike MSSF and Champion. Because WTP has not disclosed its operation, it is difficult to determine how it might be impacted by § 13-35-227(1), MCA, but given the evidence presented below we will assume there is *230 a direct impact.
¶21 Second, a material factual distinction between the present case and Citizens United is the extent of the regulatory burden imposed by the challenged law. As noted above, the Court in Citizens United emphasized the length, complexity and ambiguity of the Federal restrictions, including the power of the FEC to determine what speech is “safe for public consumption,” and the difficulty of establishing a PAC as an alternative to direct corporate spending. In contrast, under Montana law a political committee can be formed and maintained by filing simple and straight-forward forms or reports. (See e.g. §§13-37-201 and -210; 13-35-402, MCA.) Mr. Marbut in his deposition described that MSSF has established its own political committees and used them to actively participate in the Montana political process over a period of years. The evidence submitted by the State in the District Court similarly demonstrates that corporations, through their political committees organized under Montana law, are and have been a substantial presence and active participants in Montana politics. The many lobbyists and political committees who participate in each session of the Montana Legislature bear witness. Under the undisputed facts here, the political committee is an easily implemented and effective alternative to direct corporate spending for engaging in political speech. This alternative is available to any corporation in Montana, and to MSSF and Champion, as well as WTP should they choose to comply with existing Montana law. In the case of MSSF the evidence shows that it has in fact effectively used the political committee form for years and there is no showing that it could not continue to do so.
¶22 Third, the Montana law at issue in this case cannot be understood outside the context of the time and place it was enacted, during the early twentieth century. (Montana became a state in 1889.) Those tumultuous years were marked by rough contests for political and economic domination primarily in the mining center of Butte, between mining and industrial enterprises controlled by foreign trusts or corporations. These disputes had profound long-term impacts on the entire State, including issues regarding the judiciary, the location of the state capitol, the procedure for election of U.S. Senators, and the ownership and control of virtually all media outlets in the State.
¶23 Examples of well-financed corruption abound. In the fight over mineral rights between entrepreneur F. Augustus Heinze and the Anaconda Company, then controlled by Standard Oil, Heinze managed to control the two State judges in Butte, who routinely decided cases *231 in his favor. K. Ross Toole, Montana, An Uncommon Land, 196-99 (Univ. of Okla. Press 1959) the Butte judges denied being bribed, but one of them admitted that Anaconda representatives had offered him $250,000 cash to sign an affidavit that Heinze had bribed him. Toole, Montana, An Uncommon Land, 204.
¶24 In response to the legal conflicts with Heinze, in 1903 Anaconda/Standard closed down all its industrial and mining operations (but not the many newspapers it controlled), throwing 4/5 of the labor force of Montana out of work. Toole, Montana, An Uncommon Land, 206. Its price for sending its employees back to work was that the Governor call a special session of the Legislature to enact a measure that would allow Anaconda to avoid having to litigate in front of the Butte judges. The Governor and Legislature capitulated and the statute survives. See e.g. Patrick v. State, 2011 MT 169, ¶¶ 17-23, 361 Mont. 204, 257 P.3d 365.
¶25 W. A. Clark, who had amassed a fortune from the industrial operations in Butte, set his sights on the United States Senate. In 1899, in the wake of a large number of suddenly affluent members, the Montana Legislature elected Clark to the U. S. Senate. Clark admitted to spending $272,000 in the effort and the estimated expense was over $400,000. Complaints of Clark’s bribery of the Montana Legislature led to an investigation by the U. S. Senate in 1900. The Senate investigating committee concluded that Clark had won his seat through bribery and unseated him. The Senate committee “expressed horror at the amount of money which had been poured into politics in Montana elections ... and expressed its concern with respect to the general aura of corruption in Montana.” Toole, Montana, An Uncommon Land, 186-94.
¶26 In a demonstration of extraordinary boldness, Clark returned to Montana, caused the Governor to leave the state on a ruse and, with assistance of the supportive Lt. Governor, won appointment to the very U. S. Senate seat that had just been denied him. Toole, Montana, An Uncommon Land, 192-93. When the Senate threatened to investigate and unseat Clark a second time, he resigned. Clark eventually won his Senate seat after spending enough on political campaigns to seat a Montana Legislature favorable to his candidacy.
¶27 After the Anaconda Company cleared itself of opposition from Heinze and others, it controlled 90% of the press in the state and a majority of the legislature. C. B. Glasscock, The War of the Copper Kings, 290 (Grosset & Dunlap, N.Y. 1935). By 1915 the company, after having acquired all of Clark’s holdings as well as many others, “clearly *232 dominated the Montana economy and political order... [and] local folks now found themselves locked in the grip of a corporation controlled from Wall Street and insensitive to their concerns.” Michael Malone and Richard Roeder, Montana, a History of Two Centuries, 176 (Univ. of Wash. Press, Seattle 1976). Even at that time it was evident that industrial corporations controlled the state “thus converting the state government into a political instrument for the furthering and accomplishment of legislation and the execution of laws favorable to the absentee stockholders of the large corporations and inimical to the economic interests of the wage earning and farming classes who constitute by far the larger percentage of the population in Montana.” Helen Fisk Sanders, History of Montana, Vol. 1, 429-30 (Lewis Pub. Co. 1913).
¶28 In 1900 Clark himself testified in the United States Senate that <'[m]any people have become so indifferent to voting” in Montana as a result of the ‘large sums of money that have been expended in the state....” Toole, Montana, An Uncommon Land, 184-85. This naked corporate manipulation of the very government (Governor and Legislature) of the State ultimately resulted in populist reforms that are still part of Montana law. In 1906 the people voted to amend the state Constitution to allow for voter initiatives. Not long thereafter, in 1906 this new initiative power was used to enact reforms including primary elections to choose political candidates; the direct election of United States Senators; and the Corrupt Practices Act, part of which survives as § 13-35-227, MCA, at issue in this case.
¶29 The State of Montana was still contending with corporate domination even in the mid-20th century. For example, the Anaconda Company maintained controlling ownership of all but one of Mont ana’s major newspapers until 1959. Writing in 1959, historian K. Ross Toole so noted and described the state:
Today the influence of the Anaconda Company in the state legislature is unspectacular but very great. It has been a long time since the company showed the mailed fist. But no informed person denies its influence or the fact that the basic use to which it is put is to maintain the status quo-feo keep taxes down, not to rock the boat. New of the company personnel either in Butte or in New York remember F. Augustus Heinze, or even for that matter, [U. S. Senator] Joseph M. Dixon, but it would be foolish for anyone to deny that the pervasive influence of the Anaconda Company in Montana politics is part and parcel of the Montana heritage.
*233 Toole, Montana, An Uncommon Land, 244. A study of Montana in the early 1970s concluded that corporate influence of the Anaconda Company had been “replaced by a corporate power structure, with interlocked directorates, the same law firms and common business interests” among the Anaconda Company, Montana Power Company, Burlington Northern Railway and the First Bank System. Malone and Roeder, Montana, a History of Two Centuries, 290. History professor Dr. Harry Fritz, in his affidavit presented in the District Court, affirmed that the “dangers of corporate influence remain in Montana” because the resources upon which its economy depends in turn depend upon distant markets. He affirmed: “What was true a century ago is as true today: distant corporate interests mean that corporate dominated campaigns will only work ‘in the essential interest of outsiders with local interests a very secondary consideration.’” While specific corporate interests come and go in Montana, they are always present. Montana’s mineral wealth, for example, has historically been exported from the State, and that is still true today. Commonwealth Edison Co. v. State of Montana, 189 Mont. 191, 196, 615 P.2d 847, 850 (1980), aff'd, 453 U.S. 609, 101 S. Ct. 2946. The corporate power that can be exerted with unlimited political spending is still a vital interest to the people of Montana.
¶30 Furthermore, in the evidence presented below the State demonstrated aptly how even small expenditures of money can impact Montana elections. The State submitted affidavits from two respected and experienced politicians and public servants. Bob Brown, a Republican, served in the Montana House of Representative, in the Montana Senate, as the Montana Secretary of State and as an unsuccessful candidate for Governor. He retired in 2010 as a Senior Fellow at the Center for the Rocky Mountain West and the Mansfield Center, at the University of Montana. Mike Cooney, a Democrat, served in the Montana House of Representatives, in the Montana Senate, as the Montana Secretary of State, and also as an unsuccessful candidate for Governor. Both affirmed that Montana, with its small population, enjoys political campaigns marked by person-to-person contact and a low cost of advertising compared to other states. They affirmed that allowing unlimited independent expenditures of corporate money into the Montana political process would drastically change campaigning by shifting the emphasis to raising funds.
¶31 Cooney, for example, ran his first state legislative campaign for $750 as a “grassroots” effort that he believed could have been derailed by an opposing expenditure of even a couple of thousand dollars. *234 Brown affirmed that Montana politics are more susceptible to corruption than Federal campaigns, and that infusions of large amounts of corporate independent expenditure on just media coverage “could accomplish the same type of corruption of Montana politics as that which led to the enactment of’ § 13-35-227, MCA. Cooney recounted his experience from his most recent campaign when he found that voters were concerned that they “didn’t really count”in the political process unless they can make a material financial contribution, and that special interests therefore hold sway. This is much the same sentiment described by W. A. Clark to the United States Senate committee over a century ago, quoted above.
¶32 The State also presented the affidavit of Edwin Bender of the National Institute on Money in State Politics. He confirmed that under Montana law corporations can now make unlimited contributions (in amount) for independent expenditures from their corporate PACs to support or oppose candidates, directly to ballot measure committees, and to support or oppose ballot measures, and can make unlimited expenditures on lobbyists. Corporations can make contributions with the same limits as all donors from their PACs to candidates and to party committees. Bender also affirmed the low cost of political races in Montana, in comparison to other states,[4] with all legislative and statewide candidates for office raising a total of around $7 million in 2008. In that year the average candidate for the Montana House raised $7,475 and the average candidate for the Montana Senate raised $13,299. This makes it possible for direct political spending by corporations to significantly affect the outcome of elections.
¶33 Bender also affirmed that studies of election spending in the United States show that the percentage of campaign contributions from individual voters drops sharply from 48% in states with restrictions on corporate spending to 23% in states without. Evidence presented in the District Court showed that in recent years in Montana, corporate independent spending on ballot issues has far exceeded spending from other sources. He provided an extensive 2010 joint study by the Hofstra University School of Law, the Brandéis Center at the NYU School of Law and the National Institute on Money in State Politics that concluded that polling shows that 3 of 4 Americans believe that campaign contributions affect judicial decisions in states where judges are elected. The New Politics of Judicial *235 Elections 2000-2009, Charles Hall ed., Justice at Stake Campaign, 2010.
¶34 Laws that impact speech in some way must be evaluated by using the proper level of scrutiny. This is determined by the type of speech that the law affects and the type of burden that the law imposes. Davis v. Fed. Election Comm., 554 U.S. 724, 737, 128 S. Ct. 2759, 2770 (2008). Laws that place severe burdens on fully protected speech are subject to strict scrutiny, Arizona Free Enterprise Club v. Bennett,_ U.S._, 131 S. Ct. 2806, 2816-17 (2011), while laws that place only a minimal burden or that apply to speech that is not fully protected receive intermediate scrutiny. Davis, 554 U.S. at 737, 128 S. Ct. at 2771.
¶35 Montana law has long incorporated a requirement of a compelling state interest in evaluating cases involving claims that governmental action infringes upon constitutional rights. The Montana Constitution, Art. 2 § 10, expressly incorporates the standard for evaluating issues affecting the right of individual privacy. Montana Hum. Rights Div. v. City of Billings, 199 Mont. 434, 439-40, 649 P.2d 1283, 1286 (1982); St. James Comm. Hosp. v. District Court, 2003 MT 261, ¶ 4, 317 Mont. 419, 77 P.3d 534. Under Montana law the government must demonstrate a compelling interest when it intrudes on a fundamental right, and determination of a compelling interest is a question of law. State v. Pastos, 269 Mont. 43, 47, 887 P.2d 199, 202 (1994).
¶36 Based upon the background of §13-35-227(1), MCA, the State of Montana, or more accurately its voters, clearly had a compelling interest to enact the challenged statute in 1912. At that time the State of Montana and its government were operating under a mere shell of legal authority, and the real social and political power was wielded by powerful corporate managers to further their own business interests. The voters had more than enough of the corrupt practices and heavy-handed influence asserted by the special interests controlling Montana’s political institutions. Bribery of public officials and unlimited campaign spending by the mining interests were commonplace and well known to the public. Referring to W. A. Clark, but describing the general state of affairs in Montana, Mark Twain wrote in 1907 that Clark ‘is said to have bought legislatures and judges as other men buy food and raiment. By his example he has so excused and so sweetened corruption that in Montana it no longer has an offensive smell.”Mark Twain, Mark Twain in Eruption, 72 (Harper & Bros. 1940).
¶37 The question then, is when in the last 99 years did Montana lose *236 the power or interest sufficient to support the statute, if it ever did. If the statute has worked to preserve a degree of political and social autonomy is the State required to throw away its protections because the shadowy backers of WTP seek to promote their interests? Does a state have to repeal or invalidate its murder prohibition if the homicide rate declines? We think not. Issues of corporate influence, sparse population, dependence upon agriculture and extractive resource development, location as a transportation corridor, and low campaign costs make Montana especially vulnerable to continued efforts of corporate control to the detriment of democracy and the republican form of government. Clearly Montana has unique and compelling interests to protect through preservation of this statute. ¶38 While Montana has a clear interest in preserving the integrity of its electoral process, it also has an interest in encouraging the full participation of the Montana electorate. The unrefuted evidence submitted by the State in the District Court through the affidavit of Edwin Bender demonstrates that individual voter contributions are diminished from 48% of the total raised by candidates in states where a corporate spending ban has been in place to 23% of the total raised by candidates in states that permit unlimited corporate spending. The point is illustrative of Montana, a state where citizens generally support candidates with modest campaign donations. In the case of ballot issues, where corporations may make unlimited donations, the characteristics of donors are markedly different from those who give to candidates. In 2004, for example, 97 institutional donors gave 95% of the total money raised in ballot initiative campaigns, while 760 individual donors accounted for the remaining 5%. Similarly, in 2008, 34 institutional donors gave 95% of the total money donated to ballot campaigns. Moreover, unlimited corporate money would irrevocably change the dynamic of local Montana political office races, which have historically been characterized by the low-dollar, broad-based campaigns run by Montana candidates. At present, the individual contribution limit for Montana House, Senate and District Court races is $160, and for Supreme Court elections it is $310. Section 13-37-216, MCA, as adjusted as provided in (4). With the infusion of unlimited corporate money in support of or opposition to a targeted candidate, the average citizen candidate would be unable to compete against the corporate-sponsored candidate, and Montana citizens, who for over 100 years have made their modest election contributions meaningfully count would be effectively shut out of the process.
¶39 Montana also has a compelling interest in protecting and preserving its system of elected judges. In this State, the people elect *237 the Justices of the Supreme Court, the Judges of the District Courts, and most lower court judges as well. Mont. Const, art. VII, §8; §3-2-101, MCA; and § 3-5-201, MCA. Judicial elections are nonpartisan. Section 13-14-111, MCA. When only an incumbent is running for a judicial seat, the voters can approve or reject the candidate. Mont. Const, art. VII, §8 (e).
¶40 The people of the State of Montana have a continuing and compelling interest in, and a constitutional right to, an independent, fair and impartial judiciary. The State has a concomitant interest in preserving the appearance of judicial propriety and independence so as to maintain the public’s trust and confidence. In the present case, the free speech rights of the corporations are no more important than the due process rights of litigants in Montana courts to a fair and independent judiciary, and both are constitutionally protected. The Bill of Rights does not assign priorities as among the rights it guarantees. Neb. Press Assoc. v. Stuart, 427 U.S. 539, 561, 96 S. Ct. 2791, 2803 (1976).
¶41 Clearly the impact of unlimited corporate donations creates a dominating impact on the political process and inevitably minimizes the impact of individual citizens. As to candidates for political office, §13-35-227(1), MCA, is designed to further the compelling interest of the people of Montana in strong voter participation in the process. While corporations have first amendment rights in political speech, they do not have the vote.
¶42 The importance of and compelling interest in an independent judiciary is reflected as a matter of policy in Montana’s Code of Judicial Conduct.
An independent, fair and impartial judiciary is indispensable to our system of justice. The United States legal system is based upon the principle that an independent, impartial, and competent judiciary, composed of men and women of integrity, will interpret and apply the law that governs our society.
Mont. Code of Judicial Conduct, Preamble. Montana expects its judges to act to promote “public confidence in the independence, integrity, and impartiality of the judiciary” and to “avoid impropriety and the appearance of impropriety.” Mont. Code of Judicial Conduct, Rule 1.2. Because it is the duty of a judge to make decisions based upon the facts and law of every case, a judge must “to the greatest extent possible, be free and appear to be free from political influence and political pressure.” Mont. Code of Judicial Conduct, Rule 4.2, Comment [1]. ‘Public confidence in the independence and impartiality of the *238 judiciary is eroded if judges or judicial candidates are perceived to be subject to political influence.” Mont. Code of Judicial Conduct, Rule 4.2, Comment [3].
¶43 The United States Supreme Court has affirmed the importance of judicial integrity and in maintaining public respect for the judiciary.
‘Courts, in our system, elaborate principles of law in the course of resolving disputes. The power and the prerogative of a court to perform this function rest, in the end, upon the respect accorded to its judgments. The citizen’s respect for judgments depends in turn upon the issuing court’s absolute probity. Judicial integrity is, in consequence, a state interest of the highest order.” [Emphasis added.]
Caperton v. A. T. Massey Coal Co., Inc., 556 U.S. 868,_, 129 S. Ct. 2252, 2266-67 (2009) (quoting Republican Party of Minn. v. White, 536 U.S. 765, 122 S. Ct. 2528 (2002)). The Court also recognizes the importance of state codes of judicial conduct, which “serve to maintain the integrity of the judiciary and the rule of law.” Caperton, 556 U.S. at_, 129 S. Ct. at 2266. States have a “compelling interest” in preventing judges from activities that “would undermine actual impartiality, as well as its appearance.” Bauer v. Shepard, 620 F.3d 704, 711 (7th Cir. 2010) (upholding limits on judges acting in posts of political leadership and delivering political speeches). ‘The state certainly has a compelling state interest in the public’s trust and confidence in the integrity of our judicial system.” Simes v. Ark. Judicial Discipline and Disability Comm., 247 S.W.3d 876, 882 (Ark. 2007).
¶44 Montana judicial elections would be particularly vulnerable to large levels of independent spending, both in terms of fairness and in terms of the public perception of impartiality. Litigants appearing before a judge elected after a large expenditure of corporate funds could legitimately question whether their due process rights were adversely impacted. In the 2008 contested election for Chief Justice of the Montana Supreme Court, evidence presented by the State in the District Court indicated that the total expenditure for media advertising was about $60,000. It is clear that an entity like Massey Coal, willing to spend even hundreds of thousands of dollars, much less millions, on a Montana judicial election could effectively drown out all other voices. The historic Heinze-Anaconda conflict noted above illustrates the obvious negative and corrupting effects of a “bought” judiciary.
¶45 Sandra Day O’Connor recently wrote in her introduction to The *239 New Politics of Judicial Elections that the “crisis of confidence in the impartiality of the judiciary is real and growing.” The Executive Summary in that same report noted a study of the nation’s ten most costly judicial elections shows the extraordinary spending power of “super spender groups,” which are mostly corporate funded. Montana is not immune from such influence and has a compelling interest in precluding corporate expenditures on judicial elections based upon its interest in insuring judicial impartiality and integrity, its interest in preserving public confidence in the judiciary and its interest in protecting the due process rights of litigants.[5]
¶46 As discussed above, the statute has no or minimal impact on MSSF and Champion. Because of this minimal impact, the State is not required to demonstrate a compelling interest to support § 13-35-227(1), MCA. It is required only to demonstrate the less exacting sufficiently important interest. For the same reasons discussed above with regard to the compelling state interest, the statute is clearly supported by important governmental interests. Therefore, as to MSSF and Champion, it passes constitutional muster as well.
¶47 Finally, § 13-35-227(1), MCA, is narrowly tailored to meet its objectives. The statute only minimally affects entitles like MSSF and Champion. Even if it applies directly to WTP, WTP can still speak through its own political committee/PAC as hundreds of organizations in Montana do on an ongoing basis. Unlike the Federal law PACs considered in Citizens United, under Montana law political committees are easy to establish and easy to use to make independent expenditures for political speech. As the Bender affidavit submitted by the State in District Court confirms, corporate PACs can make unlimited independent expenditures on behalf of candidates. The difference then is that under Montana law the PAC has to comply with Montana’s disclosure and reporting laws. And as noted earlier, corporations are allowed to contribute to ballot issues in Montana, which is a significant distinction because ballot issues often have a direct impact on corporate business activities within Montana but present less danger of corruptive influences that have concerned Montana voters since 1912. The statute only addresses contributions regarding candidates for state political office.
*240 CONCLUSION
¶48 Citizens United does not compel a conclusion that Montana’s law prohibiting independent political expenditures by a corporation related to a candidate is unconstitutional. Rather, applying the principles enunciated in Citizens United, it is clear that Montana has a compelling interest to impose the challenged rationally-tailored statutory restrictions. We reverse the District Court and enter summary judgment in favor of the Montana Attorney General and the Commissioner of Political Practices and against WTP, MSSF and Champion. Consequently, the cross-appeal on the issue of attorney fees is moot.
JUSTICES MORRIS, COTTER, WHEAT and RICE concur.

 Under Montana law corporations are allowed to make independent expenditures on ballot issues. Montana Chamber of Commerce v. Argenbright, 226 F.3d 1049 (9th Cir. 2000).

 In a decision in October, 2010, the Montana Commissioner of Political Practices found that WTP had created a sham organization through which to channel campaign funds, and that its arguments to the contrary were deceptive. The Commissioner further concluded that WTP’s failure to register as a political committee and to disclose the true source and disposition of the funds it raised ‘frustrates the purpose of Montana’s Campaign Finance and Practices Act [and] raises the specter of corruption of the electoral process....”

 The Court noted, for example, the “scant evidence” of the effects of independent expenditures. Citizens United, 130 S. Ct. at 910.

 Montana is the fourth largest state in size, covering over 145,000 square miles, and has a population less than one million people.

 The State has additionally argued that it has a compelling interest in protecting the rights of dissenting shareholders who disagree with the political stance of corporate spending. We do not reach that issue because it has not been presented in the factual framework of this case.