OP 12-0439

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2012 MT 168

_____

MONTANANS OPPOSED TO I-166, a Political
Committee, SENATOR DAVE LEWIS,
Individually, and as an Elected Member of the
Montana Legislature, PHIL LILLEBERG,
Individually, and as an Owner of FP, INC., a
Montana Corporation,

     Petitioners,

  v.

STATE OF MONTANA HONORABLE STEVE
BULLOCK, in his capacity as Attorney General
and the HONORABLE LINDA McCULLOCH, in
her capacity as the Secretary of State,

     Respondents.

OPINION
and
ORDER

¶1 Petitioners brought an original proceeding in this Court pursuant to § 13-27-316, MCA, attacking the validity of Initiative 166. They request that this Court rule that the Attorney General and the Secretary of State did not comply with their responsibilities under law when they failed to act to bar I-166 from appearing on the general election ballot. I-166 is a ballot initiative that would establish that the policy of the State of Montana is that corporations are not entitled to constitutional rights and are not persons. It "charges" elected officials to implement the policy in part by acting to prohibit corporate political campaign spending and to limit political spending in elections. It further "charges" Montana's

1

congressional delegation with proposing an amendment to the United States Constitution establishing that corporations are not human beings entitled to constitutional rights.

¶2 The Montana Constitution, Art. III, sec. 4, empowers the people to enact laws by initiative on all matters except appropriations and local or special laws. Proponents of an initiative must gather a sufficient number of signatures on petitions that support placing the matter on the ballot. Prior to gathering signatures the proponents must submit to the Secretary of State the proposed text of the ballot issue along with a draft statement of the purpose of the initiative and a separate statement of the implications of a vote for or against the issue. The Secretary of State must submit the measure to the Legislative Services Division for review and thereafter to the Attorney General for review. Upon review by Legislative Services and upon approval of the Attorney General, the Secretary of State then notifies the proponents of the measure, who may begin gathering signatures. Section 13-27-202, MCA.

¶3 The Attorney General's review is limited to determining the sufficiency of the ballot statements and a review of the ballot issue for legal sufficiency. Section 13-27-312, MCA. The statements must explain the purpose of the measure in 100 words or less and the implications of votes for or against, in 25 words or less. Section 13-27-312(2), MCA. The Attorney General's legal sufficiency review determines whether the proposal complies with the applicable statutory and constitutional requirements. The legal sufficiency review specifically "does not include consideration of the substantive legality of the issue if approved by the voters." Section 13-27-312(7), MCA.

2

¶4      In the case of I-166, the Secretary of State received the proposal and submitted it to Legislative Services and then to the Attorney General for review.  The Attorney General revised the proponents' statement of purpose but otherwise notified the Secretary of State that the proposal met the required legal sufficiency review.  Upon notification by the Attorney General the Secretary of State notified the proponents of I-166 that they could begin gathering signatures, as provided in § 13-27-202. MCA.

¶5      The current petitioners, opponents of I-166, contend that the ballot statements do not comply with law and that the Attorney General should not have approved them.  They also contend that the initiative itself is unlawful on several grounds including that it is a resolution and not a law; that it improperly amends the Montana Constitution; and that it improperly directs elected representatives how to vote.  They sued under § 13-27-316(2), MCA, which allows opponents of a ballot issue to contest the adequacy of the explanatory statements and of the Attorney General's determination of legal sufficiency.  They seek no other relief.

¶6      As previously explained, the Attorney General's review for legal sufficiency is limited by law to determining whether the petition for a ballot issue complies with the statutory and constitutional requirements "governing submission of the proposed issue to the electors."  It does not include consideration "of the substantive legality of the issue if approved by the voters."  Section 13-27-312(7), MCA.  However, the petitioners in this case seek to have this Court require that the Attorney General undertake precisely the substantive legal review that is excluded by law.  By statute, the Attorney General had no power to

3

review the substantive legality of I-166. The petition does not allege nor does this Court find that the petition was legally insufficient as to the requirements for submission of a proposed ballot issue.

¶7     We have reviewed the explanatory statements that were approved by the Attorney General. Section 13-27-312(4), MCA, requires that the statements of purpose and of the implication of a vote must be "true and impartial" and must be in "easily understood language and may not be arguments or written so as to create prejudice for or against the issue." The petitioners request that this Court either reject the statements approved by the Attorney General, or re-write them. Upon review of the statements we determine that they meet the requirements of § 13-27-312(2) and (4), MCA.

¶8     Petitioners have not requested any other relief, *see e.g. Harper v. Waltermire*, 213 Mont. 425, 691 P.2d 826 (1984), and we decline to consider any such issues not properly pled.

¶9     For the reasons stated above, the petition is denied.

DATED this 10th day of August, 2012.


                                        /S/ MIKE McGRATH

We concur:

/S/ PATRICIA COTTER
/S/ JIM RICE
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS


4

Justice Beth Baker, concurring.

¶10    I concur with the Court's decision to reject the petition in this case and to allow I-166 to appear on the November 2012 general election ballot.  I also concur in the Court's determination that the Attorney General's ballot language fairly represents the text of the measure and therefore meets the requirements of § 13-27-312(2) and (4), MCA.

¶11    The key issue is whether the petition states a claim that may be entertained in a pre-election original proceeding before this Court.  While striving to give liberal construction to constitutional and statutory initiative and referendum provisions in order "to maintain the maximum power in the people," the Court previously has invalidated proposed ballot issues that are beyond the power that the people reserved to themselves in Article III, Sections 4 and 5, of the Montana Constitution.  *Chouteau County v. Grossman*, 172 Mont. 373, 378, 563 P.2d 1125, 1128 (1977) (invalidating county referendum proposal that concerned an administrative rather than legislative function); *Harper*, 213 Mont. at 428-29, 691 P.2d at 828-29 (invalidating initiative that proposed a legislative resolution compelling the legislature to reach a specific result).

¶12    Since those cases were decided, the legislature has acted several times over the years to clarify when legal challenges may keep an initiative or referendum off the ballot.  Section 3-2-202(3)(a), MCA, under which the petition in this case was filed, now makes clear that this Court has original jurisdiction to review "the attorney general's legal sufficiency determination in an action brought pursuant to 13-27-316."  Under § 13-27-316(2), MCA,

5

Petitioners here have requested the Court to alter the Attorney General's ballot statements and to overrule his determination that the petition is legally sufficient.

¶13     Consistent with its obligation to construe the statutes to promote, rather than to curtail, the people's right of direct democracy, the Court interprets the Attorney General's "legal sufficiency" review authority narrowly. Thus, the Court refuses to read § 13-27-312(7), MCA, as conferring power on the Attorney General to reject a citizen-initiated ballot measure for constitutional deficiency. (Opinion, ¶ 6.) The Dissent argues that the Attorney General has power to declare a proposed initiative or referendum facially unconstitutional and to prohibit its placement on the ballot. (Dissent, ¶ 40.) While I believe that it is the judicial branch of government, not the executive, that determines whether a ballot measure is facially unconstitutional, I do not confine my decision in this case to the Court's rationale that the petitioners simply failed to request the proper form of relief.

¶14     "[W]hen the legislature has prescribed a specific process for a court challenge to a ballot measure, we have refused to intervene prior to the election if that process was not followed." *Reichert v. State*, 2012 MT 111, ¶ 95, 365 Mont. 92, 278 P.3d 455 (Baker, J., concurring and dissenting) (citing *State ex rel. Mont. Citizens for the Preservation of Citizens' Rights v. Waltermire*, 224 Mont. 273, 278, 729 P.2d 1283, 1286 (1986)). In contrast to the law at the time *Harper* and *Grossman* were decided, the statutes now reflect a clear preference to defer ruling on the constitutionality of a proposed initiative petition until *after* the results of the election at which it is submitted to the voters. The governing statutes expressly preserve "the right to challenge a ballot issue enacted by a vote of the people."

6

Section 3-2-202(5), MCA. *See also* § 13-27-316(6), MCA ("This section does not limit the right to challenge a constitutional defect in the substance of an issue *approved by a vote of the people.*"). (Emphasis added.)

¶15    Petitioners' claim that I-166 is beyond the power of initiative and referendum challenges an alleged constitutional defect in the substance of the measure. Whether or not the Court possesses original jurisdiction in a proper proceeding to invalidate a proposed ballot measure prior to the election (§ 3-2-202(1), MCA), I would hold in this case that Petitioners' challenge to I-166 does not meet the Court's own requirements for discretionary exercise of its original jurisdiction (M. R. App. P. 14(2) and (4)) and must await the final election results in November. At that time, if the measure is approved by the voters, Petitioners may proceed by filing a complaint for declaratory judgment in district court and by pursuing the "normal appeal process" in this Court. M. R. App. P. 14(4). That process is better suited for the development and informed consideration of constitutional questions such as those raised in the petition. I do not read the Court's decision today to foreclose such a challenge if the measure is approved in the general election.

/S/ BETH BAKER

7

Justice James C. Nelson, dissenting.

¶16 I respectfully dissent from the Court's decision to deny relief. I agree, rather, with the arguments of Petitioners and would order the Secretary of State not to place I-166 on the 2012 general election ballot or, if the ballots have already been printed with the measure, not to count the votes. *See Reichert v. State*, 2012 MT 111, ¶¶ 1, 13, 365 Mont. 92, 278 P.3d 455. Before detailing my legal analysis, I have three observations.

## I.  Contempt

¶17 First, aside from the fatal legal problem plaguing I-166 (discussed below), this initiative is, at bottom, simply a feel-good exercise exhibiting contempt for the federal government and, particularly, the United States Supreme Court.[1] Obviously, corporations are not "human beings," and the fact that Montana voters may (or may not) have heartburn with the notion of corporations as "persons" imbued with constitutional rights is largely irrelevant. Make no mistake, I share the pain of my fellow Montanans. *See Western Tradition*, ¶ 132 (Nelson, J., dissenting). And if Montana wants to change its laws to provide that corporations are not persons and are without constitutional rights, it certainly can do that. But the I-166 exercise—at least that portion of the initiative directing Montana's elected and appointed officials how to act at the *state* level—is not going to alter these concepts at the federal level or in our sister states. Indeed, I suspect that amending

---

[1] One could refer to this as "thumbing Montana's nose" at the feds. Regardless of the nomenclature, however, the intent is the same. I thus refer to this measure as "the I-166 exercise." It is a sequel to the "Made in Montana" approach that failed in *Western Tradition*

8

Montana's laws in this fashion would put Montana corporations at a distinct disadvantage in interstate commerce and, likely, cause Montana businesses to incorporate elsewhere.

¶18    The fact is that corporations are "persons" imbued with certain constitutional rights because the Supreme Court has said so. *First Natl. Bank v. Bellotti*, 435 U.S. 765, 780 n. 15, 98 S. Ct. 1407, 1418 n. 15 (1978) ("It has been settled for almost a century that corporations are persons within the meaning of the Fourteenth Amendment."); *but see Bellotti*, 435 U.S. at 822-23, 98 S. Ct. at 1439-40 (Rehnquist, J., dissenting). The I-166 exercise, even if adopted, is not going to change that. Likewise, the Supreme Court has also said, unequivocally, that the protections of the First Amendment to the United States Constitution extend to corporations, *Citizens United v. FEC*, ___ U.S. ___, 130 S. Ct. 876, 899-900 (2010) (citing numerous cases dating back as far as the 1950s), and that the government cannot prohibit corporations from making independent expenditures to influence elections and ballot issues, *Citizens United*, 130 S. Ct. at 886, 913. Again, the I-166 exercise, even if adopted, is not going to change that.

¶19    Montana challenged the applicability of *Citizens United* to Montana in the *Western Tradition* case, citing Montana's "unique" experience with political corruption and its 1912 Corrupt Practices Act. But Montana lost—summarily, no less:

> The question presented in this case is whether the holding of *Citizens United* applies to the Montana state law. There can be no serious doubt that it does. See U.S. Const., Art. VI, cl. 2. Montana's arguments in support of the

---

*Partn. v. Mont. Atty. Gen.*, 2011 MT 328, 363 Mont. 220, 271 P.3d 1, *rev'd sub nom. Am. Tradition Partn. v. Bullock*, ___ U.S. ___, 132 S. Ct. 2490 (2012) (per curiam).

judgment below either were already rejected in *Citizens United*, or fail to meaningfully distinguish that case.

*Am. Tradition*, 132 S. Ct. at 2491. Thus, this Court's decision in *Western Tradition*— prominently cited at § 2(4) of I-166—is not the law of this State. And for the text of I-166 to imply, as it clearly does, that Montana's "uniqueness" argument and this Court's decision in *Western Tradition* are still in play is patently false and misleading. The Supreme Court in *American Tradition* unequivocally rejected Montana's "uniqueness" argument, the applicability of Montana's Corrupt Practices Act, and this Court's decision to the contrary. The Supreme Court held that *Citizens United* applies to Montana. *Citizens United* states that "[c]orporations and other associations, like individuals, contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster." *Citizens United*, 130 S. Ct. at 900 (internal quotation marks omitted). Like it or not, this is the law of the land and Montana is going to have to comply with it.

## II. False Promises

¶20    Second, and a point seemingly lost on those promoting the I-166 exercise, the Supreme Court did not rely on corporate "personhood" in its decision in *Citizen United*. Rather, the Supreme Court relied on the propositions, first, that expenditures (by a person or an organization) on political communication are a form of "speech," and second, that "citizens [have the right] to inquire, *to hear*, to speak, and to use information to reach consensus." *Citizens United*, 130 S. Ct. at 898 (emphasis added). It should be noted that these propositions were not created in *Citizens United*. Rather, they can be traced to *Buckley*

10

*v. Valeo*, 424 U.S. 1, 96 S. Ct. 612 (1976) (per curiam), and *Bellotti*, 435 U.S. 765, 98 S. Ct. 1407. Notably, the Supreme Court observed in *Bellotti* that

> [t]he court below framed the principal question in this case as whether and to what extent corporations have First Amendment rights. We believe that the court posed the wrong question. The Constitution often protects interests broader than those of the party seeking their vindication. The First Amendment, in particular, serves significant societal interests. The proper question therefore is not whether corporations "have" First Amendment rights and, if so, whether they are coextensive with those of natural persons. Instead, the question must be whether [the statute at issue] abridges expression that the First Amendment was meant to protect.

435 U.S. at 775-76, 98 S. Ct. at 1415. The *Bellotti* Court stated further that "[t]he inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual," 435 U.S. at 777, 98 S. Ct. at 1416, and that "the First Amendment *goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw*," 435 U.S. at 783, 98 S. Ct. at 1419 (emphasis added).

¶21     Hence, the Supreme Court broke no new ground in *Citizens United* when it defined the constitutional protection of speech from the perspective of the listener. "[I]t is inherent in the nature of the political process that voters must be free to obtain information from diverse sources in order to determine how to cast their votes," and the First Amendment does not allow "the exclusion of a class of speakers from the general public dialogue." *Citizens United*, 130 S. Ct. at 899. Quite the contrary, the First Amendment protects the "open marketplace" of ideas, *Citizens United*, 130 S. Ct. at 899, and prohibits restrictions on

11

political speech based on the speaker's identity, *Citizens United*, 130 S. Ct. at 902-03. Because voters must be free to obtain information from diverse sources, it is a violation of the First Amendment to control expression by distinguishing among different speakers and the subjects upon which they may speak. *Citizens United*, 130 S. Ct. at 898-99. The Supreme Court held that this country's law and tradition require more expression, not less, *Citizens United*, 130 S. Ct. at 911, and that "[w]hen Government seeks to use its full power, including the criminal law, to command *where a person may get his or her information or what distrusted source he or she may not hear*, it uses censorship to control thought," *Citizens United*, 130 S. Ct. at 908 (emphasis added).

¶22    It is undoubtedly easier to sell the proposition that corporations are not "human beings" or "persons" than it would be to persuade the electorate that the government may, in fact, restrict the sources from which voters may get their information. Yet, in terms of what these two actually accomplish, there is a world of difference. It is apparent that adoption of the *latter* proposition (by Congress and three-fourths of the state legislatures) is what's needed to overturn *Bellotti* and *Citizens United*. Any amendment designed to negate these precedents would need to exclude corporate expenditures from the definition of protected "speech" under the First Amendment. Adopting the *former* proposition that corporations are not "persons," in contrast, accomplishes absolutely nothing for First Amendment purposes— apart from wasting the electorate's time and resources.

¶23    Viewed in the context of what *Citizens United* actually held, therefore, it is evident that this initiative, as presently written, is little more than a source of false hope for many

12

voters and an illegal—not to mention futile—attempt to end-run the *Citizens United* decision. As with Montana's first attempt to do that, I suspect that if the I-166 exercise remains on the ballot and is challenged before the Supreme Court, it will suffer the same summary rejection as did this Court's decision in *Western Tradition.*

¶24 Charging Montana's congressional delegation with the obligation of offering an amendment to the United States Constitution to, among other things, overturn *Citizens United* is an equally misguided feel-good exercise in contempt. Realistically, in today's political climate, a proposal to amend the federal Constitution (a nearly impossible task under the most favorable circumstances) in order to overturn a Supreme Court decision that is wildly popular with at least one of the major political parties, with one of the major fringe parties, and, most importantly, with the very corporations that already effectively control Congress has less of a chance at success than the proverbial snowball has of surviving in Hades. It (the constitutional amendment) is not going to happen, and the attorneys and public officials promoting the I-166 exercise would have to candidly admit that. Leading voters to think otherwise is not only disingenuous, but just plain silly. An arguably more productive focus would be on strengthening the disclosure laws. If voters have the right to obtain information from diverse sources in order to make informed choices, as the Supreme Court has said, then they also have a corresponding right to know who is providing the information and the ability to judge the credibility, motives, and agenda of the speaker. *Citizens United*, 130 S. Ct. at 914.

¶25 Even assuming, for the sake of discussion, that a federal constitutional amendment were to be adopted, such an amendment would necessarily have to amend the First Amendment itself—or even "repeal" it, as was done to the Eighteenth Amendment. *See* U.S. Const. amend. XXI, § 1 ("The eighteenth article of amendment to the Constitution of the United States is hereby repealed."). The First Amendment, adopted in 1791, protects five freedoms: religion, speech, the press, to peaceably assemble, and to petition for redress of grievances. Important for our purposes here, it provides that "Congress shall make no law . . . abridging the freedom of speech." So, if the object of the I-166 exercise is to have Congress and the states change this provision so as not only to permit restrictions on corporate contributions and expenditures, but also to "accomplish a level playing field in election spending" (*see* I-166, § 3(1)), then it will be necessary to make significant revisions to the First Amendment's currently broad and unqualified protection of "freedom of speech." Personally, I like the First Amendment the way it is, and I would not want anyone— especially a politically polarized and dysfunctional Congress—tinkering with it. God only knows what might come out of that effort.

### III. Petitioners' Hypocrisy

¶26 As for my third observation, Petitioners' challenge, while legally sound, would be more palatable if it were not so palpably hypocritical. As the 2011 session of the Montana Legislature demonstrated time and again, there are some in that esteemed body who

14

apparently believe it is part of their job descriptions to propose or adopt resolutions and bills[2] (and issue press releases and other pronouncements) which effectively thumb Montana's nose at the federal government and federal law. *See Western Tradition*, ¶ 71 (Nelson, J., dissenting). Most thinking Montanans view this grandstanding for what it actually is: political pandering which accomplishes nothing substantive and which wastes the valuable state resources and limited time of the elected officials involved. Yet, here we are in court with Petitioners rising up in righteous indignation against the same sort of I-166 exercise. Apparently there is no shame. But then, to be right, the law does not require contrition or regret. As noted, Petitioners are legally correct.

¶27 Petitioners advance five meritorious arguments: I-166 is a resolution, not a law; I-166 requires elected officials to vote in a particular predetermined manner; I-166 is a resolution compelling Montana's congressional delegation to propose an amendment to the United States Constitution; I-166 contains more than one subject; and the statements prepared or approved by the Attorney General do not meet the requirements of law. I am satisfied, however, that the first argument is sufficient to resolve this case. The I-166 exercise facially

---

[2] A partial listing of these sorts of resolutions and bills include: HJR1 (remove gray wolf from endangered species list); HJR4 (opposing designation of national monuments without consent from the state of Montana); SJR4 (urging Congress to adopt a balanced budget amendment); SJR6 (regarding the use of federal lands); SJR7 (opposing definitions in the federal Water Pollution Control Act); SJR12 (regarding oil and gas lease development on federal lands); HB414 (providing for federal mandate accountability); SB 114 (requiring federal law enforcement to communicate with county sheriffs); and SB254 (providing state eminent domain authority for federal lands). Ironically, SB404, a bill that would have required constitutional analysis of bill draft requests, died in committee.

violates Article III, Section 4 of the Montana Constitution. My analysis below is focused on this issue.

## IV. I-166 Does Not Comply with Constitutional Requirements

¶28     As this Court recently stated, pre-election judicial review of initiatives should not be routinely conducted, so as to protect and preserve the rights which Montanans have reserved to themselves to change the laws or the Constitution through the initiative process. *Reichert v. State*, 2012 MT 111, ¶ 59, 365 Mont. 92, 278 P.3d 455. However, this Court reserves the right to declare patently defective measures invalid. *Reichert*, ¶ 59 (citing *State ex rel. Steen v. Murray*, 144 Mont. 61, 69, 394 P.2d 761, 765 (1964), *State ex rel. Harper v. Waltermire*, 213 Mont. 425, 428, 691 P.2d 826, 828 (1984), *Harper v. Greely*, 234 Mont. 259, 268, 763 P.2d 650, 656 (1988), and *Cobb v. State*, 278 Mont. 307, 311, 924 P.2d 268, 270 (1996)). Indeed, we have held that where a measure is facially defective, placing it on the ballot does nothing to protect voters' rights and instead "creates a sham out of the voting process by conveying the false appearance that a vote on the measure counts for something, when in fact the measure is invalid regardless of how the electors vote." *Reichert*, ¶ 59.

¶29     First and foremost, the I-166 exercise (the complete text of which is attached at the end of this Dissent) does not propose the enactment of any law. Indeed, as the Attorney General readily and repeatedly concedes, the I-166 exercise is framed in terms of stating a "policy" and "philosophy" and then "direct[ing]" and "charg[ing]" Montana's elected and appointed officials with "promot[ing]" and "carrying out" that policy and philosophy. *See*

I-166, §§ 3, 4. The policy and philosophy dictate that "corporations are not human beings with constitutional rights," that corporations should be prohibited "from making contributions to or expenditures on the campaigns of candidates or ballot issues," and that there should be "a level playing field in election spending." I-166, § 3. As already noted, these propositions contradict well-settled federal constitutional law.[3] Furthermore, the initiative charges Montana's congressional delegation with "proposing a joint resolution offering an amendment" to the federal Constitution which establishes that corporations are not human beings with constitutional rights, which establishes that corporate campaign contributions and expenditures may be prohibited, and which achieves "a level playing field in election spending." In sum, the I-166 exercise does not enact new law or repeal existing law—nor does it even *purport* to do so. Rather, it simply charges elected and appointed officials at the *state* level with violating the law already established by the Supreme Court and our congressional delegation at the *federal* level with pursuing a course of conduct that is not only misguided, but also virtually certain to fail. The I-166 exercise, even if adopted, cannot change federal law; it does not change state law; and it does not change the law of any sister state. Rather, the I-166 exercise simply does into the wind what most Montana children learn to avoid early in life.

---

[3] With respect to the "level playing field" policy, the Supreme Court has rejected the notion " 'that government may restrict the speech of some elements of our society in order to enhance the relative voice of others.' " *Citizens United*, 130 S. Ct. at 904 (quoting *Buckley*, 424 U.S. at 48-49, 96 S. Ct. at 649).

¶30 More to the point, Article III, Section 4 of the Montana Constitution reserves to the people of this State the right to "enact *laws* by initiative on all matters except appropriations of money and local or special laws." A "law" is "a solemn expression of the will of the supreme power of the state." Section 1-1-101, MCA. "The will of the supreme power is expressed by: (1) the constitution; (2) statutes." Section 1-1-102, MCA. Whereas a "policy" represents "[t]he general principles by which a government is guided in its management of public affairs," the "law" represents the actual "regime that orders human activities and relations through systematic application of the force of politically organized society." *Black's Law Dictionary* 1178 (Bryan A. Garner ed., 7th ed., West 1999). "The organic law is the constitution of government and is altogether written. Other written laws are denominated statutes. The written law of this state is therefore contained in its constitution and statutes and in the constitution and statutes of the United States." Section 1-1-105, MCA. Statutes which create and affect corporations are public statutes. Section 1-1-106, MCA. The Code also recognizes the decisions of this country's courts as law. Sections 1-1-107, -108, -109, MCA.

¶31 As noted already, Article III, Section 4 reserves to the people the right to enact *laws* by citizen initiative. Clearly, Montana's blackletter law does not define "law" as including "policies" and "philosophies" that one party or special interest group may wish the government and elected officials to pursue. Article III, Section 4 does not empower the people to pass policies or enact philosophies, or to direct governmental officials to pursue such policies or philosophies—setting aside the fact that, here, such direction is to actually

18

violate established federal constitutional law and precedent. The power to enact laws by the initiative process does not include the power to enact what amounts to a legislative resolution. *Harper*, 213 Mont. at 429, 691 P.2d at 828-29. And, charitably speaking, that is all the I-166 exercise is—a feel-good expression of contempt directed against the federal government and federal constitutional law. Even if enacted, the I-166 exercise would not be a "law."

¶32 The Attorney General offers the meager assertion that I-166 could be read as enacting "a statutory policy statement, not merely a resolution," and that "[s]tatutory policy statements occur throughout the Code." The Attorney General cites § 2-15-142, MCA, as an example.[4] Section 2-15-142, MCA, however, was not enacted by citizen initiative. It was enacted by the Legislature itself. *See* Laws of Montana, 2003, ch. 568, § 2. In making this argument, the Attorney General fails to recognize that the issue here is not whether *the Legislature* has the power to enact "statutory policy statements." It is whether citizens have that power in the form of citizen initiatives. Plainly, they do not. Mont. Const. art. III, § 4. Their power is limited to enacting "laws," not "statutory policy statements."

¶33 Even if we assume, for the sake of argument, that the I-166 exercise constitutes the proposal of a "law," there is another fundamental problem that condemns the initiative to obvious facial unconstitutionality. It is a firmly established principle of law that a statute or "law" is void on its face if it fails to give a person of ordinary intelligence fair notice that his

19

contemplated conduct is forbidden. No person should be required to speculate as to whether his contemplated course of action may be subject to criminal penalties. *State v. Taylor*, 2000 MT 202, ¶ 29, 300 Mont. 499, 5 P.3d 1019.

¶34 Here, the problem is manifest. First, if an elected or appointed public official violates I-166 as "law," then that person can be prosecuted for a misdemeanor crime. *See* I-166, § 8 (stating that the initiative is "intended to be codified as an integral part of Title 13 and the provisions of Title 13 apply to" the initiative); § 13-35-103, MCA (stating that "[a] person who knowingly violates a provision of the election laws of this state for which no other penalty is specified is guilty of a misdemeanor"). Second, and more problematic, it is not reasonably clear what I-166, as "law," would require.

¶35 Under § 3(1) of the initiative, in order to effectuate the policy and philosophy that corporations (a) are not human beings (no court has ever said they were), (b) are not entitled to constitutional rights (the Supreme Court has said they are), and (c) should not be permitted to make campaign contributions or expenditures for or against candidates and ballot issues (the Supreme Court has said they may), elected and appointed officials in Montana are "charged to promote actions that accomplish a level playing field in election spending." Some "general" directives then follow at § 3(2) which are in the nature of policy statements—and nearly all of which, again, have been rejected by the Supreme Court. For example, these policy statements include that money is not speech; that constitutional rights

---

[4] This statute directs state agencies to consider certain guiding principles when formulating or implementing policies or administrative rules that have direct tribal

belong to human beings, not corporations; that corporate use of wealth is corrosive and distorting; that there should be a level playing field in campaign spending; and that there should be limits on "large" contributions to or expenditures for the benefit of any campaign by any source. If the I-166 exercise were to be construed as an actual "law," how would any public official of ordinary intelligence have fair notice that his or her contemplated act (or failure to act) is unlawful, so that he or she could avoid violating the law and being subjected to possible criminal sanctions? The public official's task in this regard is virtually impossible. At the outset, in order to comply with the supposed I-166 "law," the public official will have to violate extant federal law, as already discussed. Then, the public official will have to make sense of I-166's amorphous and vague terms, phrases, and concepts—including "level playing field," "large" contributions and expenditures, and "promoting" actions that accomplish the stated policies. I-166 provides no guidelines, no definitions, and no parameters. What, for example, is too "large" a campaign contribution? $300? $10,000? $5,000,000? Maybe $300 is too large in Teton County, but $5,000,000 is not too large in Yellowstone County. Who knows? And, what, exactly, is the official supposed to do about a too "large" campaign contribution? How, exactly, is the public official to "level the playing field" and reduce the "corrosive and distorting" effects of "immense" aggregations of corporate wealth?

¶36    Assuming I-166 to be a "law," a public official who fails to correctly interpret these terms may be subject to prosecution for the offense of failing to "promote" I-166's policy.

---

implications. Section 2-15-142, MCA.

21

Likewise, if a member of Montana's congressional delegation does not encourage and promote the futile constitutional amendment heretofore discussed, the offending senator or representative may be charged with a misdemeanor. But is anyone—the Attorney General included—really naïve enough to believe this could happen? Good grief! It is ludicrous in the extreme to argue that I-166, as "law," would give any public official fair notice of what he or she is supposed to do or not do. While I-166, as "law," may direct people how to *think*—a dubious proposition in its own right—it gives them no fair notice at all of how to *act* in a fashion so as to avoid the criminal penalties that may result from its violation. Thus, even if the I-166 exercise is deemed a proposed "law" for purposes of saving it under Article III, Section 4, the initiative is facially, unalterably, and inseverably void for constitutional vagueness.

¶37    I understand the frustration with the Supreme Court's decision in *Citizens United*. I understand the frustration with the ability of corporate America to control elections and legislative and executive branches of state and federal government. And I understand the frustration with the certain knowledge that soon corporate America will be in control of the judicial branch of government as well. However, shooting popcorn at a brick wall will accomplish nothing, even if it makes one feel good. Those who aim to change the situation are going to have to get a different gun.

¶38    In sum, this Court reserves the right to declare patently defective measures invalid. *See Reichert*, ¶ 59, and cases cited therein. Indeed, we have very recently held that placing a facially defective measure on the ballot does nothing to protect voters' rights and instead

creates a sham out of the voting process by conveying the false appearance that a vote on the measure counts for something, when in fact the measure is invalid regardless of how the electors vote. *Reichert*, ¶ 59. That is the case here. The I-166 exercise is a sham; it is nothing but an exercise in feel-good contempt of the federal government and federal law. The proposed initiative does not seek to enact "law." It seeks, rather, to enact unenforceable political policies and philosophies. Therefore, the I-166 exercise cannot constitutionally be proposed as a ballot measure under Article III, Section 4 of Montana's Constitution. And even if, assuming for the sake argument, the I-166 exercise is deemed to be a proposed "law," the "law" is facially, unalterably, and inseverably void for constitutional vagueness.

## V. The Court's Approach

¶39 As a final matter, I note my disagreement with the Court's conclusion that we cannot grant relief.

¶40 The Court concludes that the Attorney General's "legal sufficiency" determination is limited under § 13-27-312(7), MCA, to a non-substantive review of the ballot language. Opinion, ¶ 6. To the contrary, the plain language of this statute defines "legal sufficiency" to mean "that the petition complies with statutory and constitutional requirements governing submission of the proposed issue to the electors." As discussed above, the problem here is that the citizen-initiative process is available under Article III, Section 4 of the Montana Constitution *only* to enact "laws." Mont. Const. art. III, § 4(1) ("The people may enact *laws* by initiative on all matters except appropriations of money and local or special laws." (emphasis added)). This constitutional process is not available to have the people enact

23

"policies" and philosophies and to charge public officials with encouraging misguided, impossible, and (at least under federal law) patently illegal acts. All that the I-166 exercise purports to do is (1) set forth a policy and (2) direct elected and appointed officials to promote that policy. *See* I-166, §§ 3, 4. Accordingly, the I-166 exercise *on its face* does not "compl[y] with . . . constitutional requirements governing submission of the proposed issue to the electors," and the Attorney General should have rejected the measure as being facially unconstitutional under § 13-27-312(7), MCA.

¶41 Presumably, under the Court's approach, if some group got sufficient signatures to put on the ballot an initiative which adopted a policy and philosophy that, contrary to *Loving v. Va.*, 388 U.S. 1, 87 S. Ct. 1817 (1967), Caucasians should not inter-marry with Native Americans or African Americans and which charged state and local officials with working diligently to carry out that policy, then, so long as the Attorney General found no fault with the ballot language, this patently and facially unconstitutional measure would have to be put to the vote. I cannot agree with such a cabined and absurd interpretation of § 13-27-312(7), MCA.

## VI. Conclusion

¶42 Based on the foregoing, I would grant the Petitioners' petition and order the Secretary of State not to place I-166 on the 2012 general election ballot or, if the ballots have already been printed with the measure, not to count the votes.

¶43 I dissent.

/S/ JAMES C. NELSON

[Appendix to Dissent on the following 4 pages.]

**BALLOT LANGUAGE FOR INITIATIVE NO. 166 (I-166)**

INITIATIVE NO. 166

A LAW PROPOSED BY INITIATIVE PETITION

Ballot initiative I-166 establishes a state policy that corporations are not entitled to constitutional rights because they are not human beings, and charges Montana elected and appointed officials, state and federal, to implement that policy. With this policy, the people of Montana establish that there should be a level playing field in campaign spending, in part by prohibiting corporate campaign contributions and expenditures and by limiting political spending in elections. Further, Montana's congressional delegation is charged with proposing a joint resolution offering an amendment to the United States Constitution establishing that corporations are not human beings entitled to constitutional rights.

[]      FOR charging Montana elected and appointed officials, state and federal, with implementing a policy that corporations are not human beings with constitutional rights.

[]      AGAINST charging Montana elected and appointed officials, state and federal, with implementing a policy that corporations are not human beings with constitutional rights.

**THE COMPLETE TEXT OF INITIATIVE NO. 166 (I-166)**

BE IT ENACTED BY THE PEOPLE OF THE STATE OF MONTANA:

NEW SECTION. **Section 1. Short title.** [Sections 1 through 4] may be cited as the "Prohibition on Corporate Contributions and Expenditures in Montana Elections Act."

NEW SECTION. **Section 2. Preamble.** The people of the state of Montana find that:

(1)  since 1912, through passage of the Corrupt Practices Act by initiative, Montana has prohibited corporate contributions to and expenditures on candidate elections;

(2)  in 1996, by passage of Initiative No. 125, Montana prohibited corporations from using corporate funds to make contributions to or expenditures on ballot issue campaigns;

(3) Montana's 1996 prohibition on corporate contributions to ballot issue campaigns was invalidated by *Montana Chamber of Commerce v. Argenbright*, 226 F.3d 1049 (2000).  Montana's 1912 prohibition on corporate contributions to and expenditures on candidate elections is also being challenged under the holding of *Citizens United v. FEC*, 558 U.S. _____, 130 S.Ct. 876 (2010).  This decision equated the political speech rights of corporations with those of human beings.

(4)  in 2011 the Montana Supreme Court, in its decision, *Western Tradition Partnership, Inc. v. Attorney General,* 2011 MT 328, upheld Montana's 1912 prohibition on corporate contributions to and expenditures on candidate campaigns, stating in its opinion as follows:

(a)  examples of well-financed corruption involving corporate money abound in Montana;

(b)  the corporate power that can be exerted with unlimited corporate political spending is still a vital interest to the people of Montana;

(c)  corporate independent spending on Montana ballot issues has far exceeded spending from other sources;

(d)  unlimited corporate money into candidate elections would irrevocably change the dynamic of local Montana political office races;

(e)  with the infusion of unlimited corporate money in support of or opposition to a targeted candidate, the average citizen candidate in Montana would be unable to compete against the corporate-sponsored candidate, and Montana citizens, who for over 100 years have made their modest election contributions meaningfully count, would be effectively shut out of the process; and

(f)  clearly the impact of unlimited corporate donations creates a dominating impact on the Montana political process and inevitably minimizes the impact of individual Montana citizens.

NEW SECTION. **Section 3. Policy.** (1) It is policy of the state of Montana that each elected and appointed official in Montana, whether acting on a state or federal level, advance the philosophy that corporations are not human beings with constitutional rights and that each such elected and appointed official is charged to act to prohibit, whenever possible, corporations from making contributions to or expenditures on the campaigns of candidates or ballot issues. As part of this policy, each such elected and appointed official in Montana is charged to promote actions that accomplish a level playing field in election spending.

(2) When carrying out the policy under subsection (1), Montana's elected and appointed officials are generally directed as follows:

(a) that the people of Montana regard money as property, not speech;

(b) that the people of Montana regard the rights under the United States Constitution as rights of human beings, not rights of corporations;

(c) that the people of Montana regard the immense aggregation of wealth that is accumulated by corporations using advantages provided by the government to be corrosive and distorting when used to advance the political interests of corporations;

(d) that the people of Montana intend that there should be a level playing field in campaign spending that allows all individuals, regardless of wealth, to express their views to one another and their government; and

(e) that the people of Montana intend that a level playing field in campaign spending includes limits on overall campaign expenditures and limits on large contributions to or expenditures for the benefit of any campaign by any source, including corporations, individuals, or political committees.

NEW SECTION. **Section 4. Promotion of policy by elected or appointed officials.**

(1) Montana's congressional delegation is charged with proposing a joint resolution offering an amendment to the United States constitution that accomplishes the following:

(a) overturns the U.S. Supreme Court's ruling in *Citizens United v. Federal Election Commission;*

(b) establishes that corporations are not human beings with constitutional rights;

(c) establishes that campaign contributions or expenditures by corporations, whether to candidates or ballot issues, may be prohibited by a political body at any level of government; and

(d) accomplishes the goals of Montanans in achieving a level playing field in election spending.

(2) Montana's congressional delegation is charged to work diligently to bring such a joint resolution to a vote and passage, including use of discharge petitions, cloture, and every other procedural method to secure a vote and passage.

(3) The members of the Montana legislature, if given the opportunity, are charged with ratifying any amendment to the United States constitution that is consistent with the policy of the state of Montana.

28

NEW SECTION. **Section 5. Saving clause.** [This act] does not affect rights and duties that matured, penalties that were incurred, or proceedings that were begun before [the effective date of this act.]

NEW SECTION. **Section 6. Severability.** If a part of [this act] is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of [this act] is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.

NEW SECTION. **Section 7. Effective date.** [This act] is effective upon approval by the electorate.

NEW SECTION. **Section 8. Codification instruction.** Sections [1 through 4] are intended to be codified as an integral part of Title 13 and the provisions of Title 13 apply to sections [1 through 4].