732 S.E.2d 507

STATE of West Virginia, ex rel, Allen H. LOUGHRY, II, candidate for the Supreme Court of Appeals of West Virginia, Petitioner

v.

Natalie E. TENNANT, West Virginia Secretary of State; Natalie E. Tennant, Gary A. Collias, William N. Renzelli, and Robert Rupp, members of the West Virginia State Election Commission; Glen B. Gainer, III, West Virginia State Auditor; and John Perdue, West Virginia State Treasurer, Respondents

and

Darrell V. McGraw, Jr., West Virginia Attorney General, Intervenor.

No. 12–0899.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 4, 2012.

Decided Sept. 7, 2012.

**632**

Marc E. Williams, Esq., Jenna E. Hess, Esq., Randall L. Saunders, Esq., Nelson, Mullins, Riley & Scarborough, LLP, Huntington, WV, for Petitioner.

Lisa A. Hopkins, Esq., General Counsel, West Virginia State Auditor's Office, Charleston, WV, for Respondent, Glen B. Gainer, III.

J. Adam Skaggs, Esq., Matthew Menendez, Esq., Brennan Center for Justice at NYU School of Law, New York, NY, for Petitioner.

Silas B. Taylor, Esq., Managing Deputy Attorney General, Charleston, WV, for Respondent, West Virginia State Election Commission.

Diana Stout, Esq., Special Assistant Attorney General, Charleston, WV, for Respondent, West Virginia State Treasurer, John Perdue.

Darrell V. McGraw, Jr., Attorney General, Barbara H. Allen, Esq., Managing Deputy Attorney General, for Intervenor, Darrell V. McGraw, Jr.

Anthony J. Delligatti, Pro Se, Fairmont, WV, Amicus Curiae.

Anthony J. Majestro, Esq., Powell & Majestro, PLLC, Charleston, WV, for Amicus Curiae, Michael Callaghan.

KETCHUM, Chief Justice:

The Petitioner, Allen H. Loughry II, a candidate for the Supreme Court of Appeals of West Virginia, invokes this Court's original jurisdiction seeking a writ of mandamus to compel the Respondents [1] to comply with *W.Va.Code* § 3–12–11(e) and approve the release of matching funds [2] to his campaign. The Petitioner is a participant in the West Virginia Supreme Court of Appeals Public Campaign Financing Pilot Program (the "Pilot Program"), *W.Va.Code* § 3–12–1 *et seq.* [2010]. Under the Pilot Program, a candidate who accepts public financing and complies with the requirements set forth in the statute receives an initial disbursement to finance his/her campaign. Petitioner Loughry received an initial disbursement of $350,000 for the general election. Thereafter, a publicly financed candidate may receive additional government funding, up to $700,000, from the Pilot Program, in direct response to the campaign spending of privately financed candidates. Once a set spending limit is exceeded by a privately financed candidate, a publicly financed candidate shall receive these matching funds pursuant to *W.Va.Code* § 3–12–11(e)–(i).

The Petitioner argues that because he has complied with each of the applicable requirements set forth in the Pilot Program, and because one of the privately financed candidates has spent a sum sufficient to trigger the matching funds provisions, the West Virginia State Election Commission ("Election

---

1. The Respondents are the West Virginia Secretary of State, Natalie Tennant; the members of the West Virginia State Election Commission, Natalie Tennant, Gary A. Collias, William N. Renzelli, and Robert Rupp; the West Virginia State Auditor, Glen B. Gainer, III; and the West Virginia State Treasurer, John Perdue. We also note that West Virginia Attorney General Darrell V. McGraw, Jr., is an Intervenor in this matter.

2. These funds have been referred to by a variety of different names including "matching funds," "additional funds," and "rescue funds." We will refer to them as "matching funds."

Commission") is statutorily required to disburse matching funds to his campaign.

After the Legislature enacted the Pilot Program in 2010, the U.S. Supreme Court struck down a similar matching funds provision enacted by Arizona. *See Arizona Free Enterprise Club's Freedom Club PAC v. Bennett,* —— U.S. ——, 131 S.Ct. 2806, 180 L.Ed.2d 664 (2011). Arizona's matching funds provisions are similar to the matching funds provided for by our Pilot Program: once a privately financed candidate exceeds a set spending limit, a publicly financed candidate receives roughly one dollar, paid for by the government's matching funds provision, for every dollar spent by an opposing privately financed candidate. Thus, privately financed candidates are faced with a choice: spend their campaign funds over a set limit to get out their political message, thereby generating matching government funds for their publicly financed opponent or refrain from spending over a set amount to prevent the government from providing matching funds to their opponent. The U.S. Supreme Court discussed this choice in *Bennett* and determined that "Arizona's matching funds scheme substantially burdens protected political speech without serving a compelling state interest and therefore violates the First Amendment." *Bennett,* 131 S.Ct. at 2813.

Thus, our initial inquiry goes beyond whether the Election Commission has a statutory duty to authorize the release of the matching funds provided for under the Pilot Program to Petitioner Loughry. The predicate question is whether the matching funds provisions set forth in *W.Va.Code* § 3–12–11 *et seq.,* violate the free speech clause of the First Amendment to the United States Constitution.[3]

Having fully considered the parties' arguments, as well as the briefs of *amici curiae,*[4]

and the applicable law, this Court denies the writ of mandamus requested by the Petitioner.

## I. Facts & Background

. The public financing Pilot Program was adopted after then-Governor Joe Manchin created an Independent Commission on Judicial Reform ("Commission") in 2009 to "evaluate and recommend proposals for judicial reform in West Virginia." The Honorary Chairwoman of the Commission was retired U.S. Supreme Court Justice Sandra Day O'Connor. The Commission identified three "troubling trends" that led to its creation and which it sought to address: (1) the erosion of the public's confidence in the State's judicial system; (2) the voluminous caseload before the West Virginia Supreme Court of Appeals; and (3) the surge in judicial campaign expenditures. The Commission noted that "[a]s campaign spending has increased, so too has the perception that interested third parties can sway the court system in their favor through monetary participation in the election process."[5] The Commission stated that the increases in campaign spending, coupled with the Supreme Court's ruling in *Caperton v. A.T. Massey Coal Co., Inc.,* 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009), could have a detrimental effect on the public's perception of West Virginia's judicial system. In *Caperton,* the Supreme Court held that a litigant's outsized campaign spending during the 2004 West Virginia Supreme Court of Appeals election created a constitutionally impermissible risk of judicial bias.

After studying the issues facing West Virginia's judiciary, the Commission recommended that the Legislature adopt a public financing Pilot Program for the West Virgi-

---

3. The Respondents have not challenged the constitutionality of the Pilot Program. However, the Intervenor, Attorney General Darrell V. McGraw, Jr. argues that the Pilot Program's matching funds provisions violate the free speech clause of the First Amendment to the United States Constitution.

4. Anthony J. Delligatti's *amicus* brief included his law review article, "A Horse of a Different Color: Distinguishing the Judiciary from the Po-

litical Branches in Campaign Financing." 115 W.Va. L. Rev. (forthcoming in October 2012). This law review article is thought provoking and provided helpful information to the Court.

5. Candidates running for a seat on the Supreme Court of Appeals in 2000 raised a total of $1.4 million; in 2004, that number doubled to $2.8 million; and in 2008, it rose to $3.3 million. *See W.Va.Code* § 3–12–2(4)–(6).

nia Supreme Court of Appeals election in 2012.[6] The Commission explained:

> West Virginia has witnessed a steady and substantial increase in the amount of money raised and spent by candidates in elections for Supreme Court of Appeals seats. As campaign expenditures rise, so too does the threat of bias, and certainly the public perception of bias, as candidates face mounting pressure to accept donations from lawyers and parties that may appear before them once they take a seat on the bench. This Commission therefore recommends a public financing pilot program to investigate the potential for removing the specter of out-of-control and otherwise troublesome spending from judicial elections.[7]

The Commission recommended that the public financing Pilot Program include a "provision for [the state to provide] 'rescue funds' to be disbursed if a non-participating candidate exceeds certain spending limits."

After the Commission's report was issued, the Legislature enacted the West Virginia Supreme Court of Appeals Public Campaign Financing Pilot Program, *W.Va.Code* § 3–12–1 *et seq.* [2010]. The stated purpose of the Pilot Program is to:

> [E]nsure the fairness of democratic elections in this state, protect the Constitutional rights of voters and candidates from the detrimental effects of increasingly large amounts of money being raised and spent to influence the outcome of elections, protect the impartiality and integrity of the judiciary, and strengthen public confidence in the judiciary[.]

*W.Va.Code* § 3–12–2(9).

Petitioner Loughry is the only candidate participating in the Pilot Program. The other three candidates for the West Virginia Supreme Court of Appeals, Democrats Letitia "Tish" Chafin and current Supreme Court Justice Robin J. Davis, as well as Republican candidate Circuit Judge John Yoder, are non-participating, privately financed candidates. It is undisputed that Petitioner Loughry has complied with the eligibility requirements set forth in the Pilot Program,[8] and that he received the initial statutory disbursement of $350,000 following the primary election pursuant to *W.Va.Code* § 3–12–11(b)(1).[9] This initial disbursement is not dependent on the amount of money raised or spent by a privately financed candidate.

The Pilot Program includes matching funds provisions for participating candidates. *West Virginia Code* § 3–12–11(e) states that a participating candidate may receive additional matching funds if a privately financed candidate's spending exceeds twenty percent of the initial disbursement by the state to a participating candidate. *West Virginia Code* § 3–12–11(f) provides matching funds to be disbursed to a participating candidate based upon the amount of expenditures made on behalf of a privately financed candidate, either alone or in combination with the privately financed candidate's spending. The full statutory text of the matching funds provisions are set forth in *W.Va.Code* § 3–12–11(e)–(i), and are as follows:

> (e) If the commission determines from any reports filed pursuant to this chapter or by other reliable and verifiable information obtained through investigation that a nonparticipating candidate's campaign expenditures or obligations, in the aggregate, have exceeded by twenty percent the initial funding available under this section [to] any certified candidate running for the same office, the commission *shall authorize the release of additional funds in the amount of the reported excess to any opposing certified candidate for the same office.*

> (f) If the State Election Commission determines from any reports filed pursuant

---

6. Two of the five seats on the West Virginia Supreme Court of Appeals are up for election in 2012.

7. The Commission urged the Legislature to model the public financing program after the Judicial Campaign Reform Act that North Carolina passed in 2002.

8. The eligibility requirements are contained in *W.Va.Code* § 3–12–7 through 3–12–10.

9. *W.Va.Code* § 3–12–11(b)(1) states "In a contested general election, a certified candidate may receive from the fund an amount not to exceed $350,000."

to this chapter or by other reliable and verifiable information obtained through investigation that independent expenditures on behalf of a nonparticipating candidate, either alone or in combination with the nonparticipating candidate's campaign expenditures or obligations, have exceeded by twenty percent the initial funding available under this section to any certified candidate running for the same office, the commission *shall authorize the release of additional funds in the amount of the reported excess to any certified candidate who is an opponent for the same office.*

(g) If the commission determines from any reports filed pursuant to this chapter or by other reliable and verifiable information obtained through investigation that independent expenditures on behalf of a certified candidate, in combination with the certified candidate's campaign expenditures or obligations, exceed by twenty percent the initial funding available under this section to any certified candidate running for the same office, the State Election Commission *shall authorize the release of additional funds in the amount of the reported excess to any other certified candidate who is an opponent for the same office.*

(h) Additional funds released under this section to a certified candidate may not exceed $400,000 in a primary election and $700,000 in a general election.

(i) In the event the commission determines that additional funds beyond the initial distribution are to be released to a participating candidate pursuant to the provisions of the section, the commission, acting in concert with the State Auditor's office and the State Treasurer's office, shall cause a check for any such funds to be issued to the candidate's campaign depository within two business days.

(Emphasis added).

The Legislature enacted the Pilot Program in 2010. In 2011, the U.S. Supreme Court decided *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett, supra.* In *Bennett,* the Court applied a strict scrutiny analysis to an Arizona law which provided matching funds to candidates for legislative and executive state offices. The Supreme Court determined that the law "substantially burdens protected political speech without serving a compelling state interest and therefore violates the First Amendment." *Id.,* 131 S.Ct. at 2813.

On June 30, 2011, Secretary of State Natalie Tennant requested an opinion from the Attorney General regarding the constitutionality of the matching funds provisions of the Pilot Program "in light of the recent United States Supreme Court ruling on the Arizona law." The Attorney General's office reviewed *Bennett* and concluded that the matching funds provisions of West Virginia's Pilot Program "constitute a substantial burden on the speech of privately financed candidates and are therefore violative of the United States Constitution, amend. I." [10]

On July 10, 2012, privately financed candidate Justice Robin J. Davis reported to the Secretary of State that her campaign had spent $494,471.46 during the general election period. Petitioner Loughry argues that because a non-participating candidate's expenditures have exceeded his initial funding ($350,000) by twenty percent, he is entitled to the matching funds as set forth in *W.Va.Code* § 3–12–11(e).[11] On July 17, 2012, the Election Commission [12] held an emergency meeting to address the release of the matching funds to Petitioner Loughry. By a vote of 4–0, the Election Commission members agreed

---

**10.** *See Office of the Attorney General State of West Virginia, Re: Opinion Request of June 30, 2011,* 2011 WL 3680078.

**11.** Petitioner Loughry states that his campaign is entitled to the amount spent by the non-participating candidate during the general election period ($494,471.46) minus the initial disbursement given to him for the general election ($350,000). Hence, Petitioner Loughry asserts his campaign is entitled to receive $144,471.46.

**12.** The Election Commission is normally comprised of five members: the Secretary of State and four individuals appointed by the Governor. The Election Commission is currently comprised of four members, however, due to the recent resignation of Brent Pauley whose successor has yet to be appointed.

that the privately financed candidate had expended a sum sufficient to trigger the matching funds provisions of the Pilot Program. However, the Election Commission members deadlocked, voting 2–2, on a motion to authorize the release of the matching funds to Petitioner Loughry. It appears the Election Commission members voting against the release of the matching funds relied on the Attorney General's conclusion that the matching funds were unconstitutional after the Supreme Court's *Bennett* ruling.[13]

On July 30, 2012, Petitioner Loughry filed the instant petition seeking a writ of mandamus to compel the Respondents to comply with *W.Va.Code* § 3–12–11(e) and authorize the release of the matching funds to his campaign.

## II. Standard of Review

■ Petitioner Loughry brings this case seeking the extraordinary remedy of relief in mandamus. This Court has previously set forth our standard of review when considering a mandamus action. "A writ of mandamus will not issue unless three elements coexists—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." Syllabus Point 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969).

■ " 'To entitle one to a writ of mandamus, the party seeking the writ must show a clear legal right thereto and a corresponding duty on the respondent to perform the act demanded.' Syl. Pt. 2, *State ex rel. Cooke v. Jarrell*, 154 W.Va. 542, 177 S.E.2d 214

(1970).'' Syllabus Point 1, *Dadisman v. Moore*, 181 W.Va. 779, 384 S.E.2d 816 (1989).

## III. Analysis

Petitioner Loughry argues that no court has held that West Virginia's Pilot Program is unconstitutional and the Election Commission must authorize the release of the matching funds to him because government officials cannot "pick and choose what pieces of West Virginia law they carry out[.]" Managing Deputy Attorney General Barbara Allen ("Deputy A.G. Allen")[14] argues that the matching funds provisions are unconstitutional under the Free Speech Clause of the First Amendment to the United States Constitution[15] and that the Election Commission is under no duty to implement a statute that is unconstitutional. Our analysis will focus on whether the matching funds provisions of the Pilot Program violate the Free Speech Clause of the First Amendment in order to determine whether Petitioner Loughry is entitled to a writ of mandamus.

Our examination of the matching funds provisions begins with *Davis v. Federal Election Comm'n*, 554 U.S. 724, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008). In *Davis*, the Supreme Court considered a challenge to the "Millionaire's Amendment" of the Bipartisan Campaign Reform Act of 2002. Under the amendment, if a candidate for the U.S. House of Representatives spent more than $350,000 of his/her personal funds, the opponent of that candidate was permitted to collect individual contributions up to $6,900 per contributor, three times the normal limit. 554 U.S. at 729, 128 S.Ct. 2759. The Supreme Court concluded that the amendment was unconstitutional because it forced a candidate "to choose between the First Amend-

---

**13.** According to the recorded minutes of this meeting, Election Commission member Gary Collias cited a "U.S. Supreme Court decision (that) appears to invalidate the West Virginia law ... He (Mr. Collias) in good faith feels that he cannot vote to release these funds."

**14.** When discussing arguments made by Managing Deputy A.G. Allen, we are referencing the arguments contained in the brief filed by Darrell V. McGraw Jr. and Barbara H. Allen in the Attorney General's role as an Intervenor. We note that Managing Deputy Attorney General Silas B. Taylor filed a brief on behalf of Respon-

dent West Virginia Election Commission. Deputy Attorney General Taylor's arguments are largely consistent with the arguments raised in Petitioner Loughry's brief. For the ease of the reader, we attribute these arguments to "Petitioner Loughry."

**15.** The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech," U.S. Const. Amend. I, and applies to the states through Section 1 of the Fourteenth Amendment, U.S. Const. Amend XIV, § 1.

ment right to engage in unfettered political speech and subjection to discriminatory fundraising limitations." 554 U.S. at 739, 128 S.Ct. 2759. The Court found that the amendment constituted an unprecedented "penalty" because it imposed a "substantial" burden on the exercise of a candidate's First Amendment right to use personal funds for campaign speech. 554 U.S. at 739–40, 128 S.Ct. 2759.

In 2010, the Supreme Court addressed *corporate* restrictions on campaign speech in *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). *Citizens United* held that political speech does not lose First Amendment protection because its source is a corporation. 130 S.Ct. at 900. The Court "rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'" *Id.* In arriving at this holding, the Court observed that the *"First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office."* 130 S.Ct. at 898 (internal citation omitted, emphasis added). "Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* (internal citation omitted).

One year after *Citizens United* was decided, the Supreme Court considered a specific challenge to *matching funds* in *Arizona Free Enterprise Club's PAC v. Bennett, supra.* In *Bennett,* the Court examined the Arizona Citizens Clean Elections Act, which created a public financing system to fund candidates running for executive and legislative state offices. Under Arizona's law, matching funds were triggered when a privately financed candidate's expenditures, combined with the expenditures of independent groups made in support of the privately financed candidate or in opposition to the publicly financed candidate, exceeded the allotment of state funds provided to the publicly financed candidate.

The Court held that Arizona's matching funds law "substantially burdens protected political speech without serving a compelling state interest and therefore violates the First Amendment." 131 S.Ct. at 2813. The Court closely followed the logic of *Davis* and stated that "like the burden placed on speech in *Davis,* the matching funds provision 'imposes an unprecedented penalty on any candidate who robustly exercises [his] First Amendment rights.'" 131 S.Ct. at 2818 (citation omitted). The Court explained that:

[T]he goal of creating a viable public financing scheme can only be pursued in a manner consistent with the First Amendment ... Arizona's program gives money to a candidate in direct response to the campaign speech of an opposing candidate or independent group. It does this when the opposing candidate has chosen not to accept public financing, and has engaged in political speech above a level set by the State. The professed purpose of the state law is to cause a sufficient number of candidates to sign up for public financing ... which subjects them to the various restrictions on speech that go along with that program. This goes too far; Arizona's matching funds provision substantially burdens the speech of privately financed candidates and independent expenditure groups without serving a compelling state interest.

131 S.Ct. at 2828.

Petitioner Loughry attempts to distinguish *Bennett* by arguing that it "dealt with a statute that provided supplemental campaign funds to candidates in non-judicial elections only ... and the Supreme Court has repeatedly made clear that judicial elections present unique state interests that non-judicial elections do not." Petitioner Loughry argues that *Caperton v. A.T. Massey Coal Co., Inc., supra,* set forth these unique state interests that judicial elections present— maintaining an impartial judiciary that is free from the appearance of bias. Because these state interests are only present in judicial elections, Petitioner Loughry argues that the analysis set forth in *Bennett* is not applicable to judicial elections.

Additionally, Petitioner Loughry relies upon *North Carolina Right to Life Committee Fund For Independent Political Expen-*

*ditures v. Leake,* 524 F.3d 427 (4th Cir.2008), *cert. denied,* 555 U.S. 994, 129 S.Ct. 490, 172 L.Ed.2d 357 (2008), in which the Fourth Circuit upheld a North Carolina statute providing matching campaign funds to publicly financed candidates in judicial elections. In *Leake* the court determined that "the state's provision of matching funds does not burden the First Amendment rights of nonparticipating candidates ... or independent entities ... that seek to make expenditures on behalf of nonparticipating candidates." 524 F.3d at 437. *Leake* further concluded that "the distribution of these [matching] funds 'furthers, not abridges, pertinent First Amendment values' by ensuring that the participating candidate will have an opportunity to engage in responsive speech.'" *Id.* (citation omitted).

Deputy A.G. Allen raises a number of arguments in support of the position that *Bennett's* holding applies to judicial elections. First, Deputy A.G. Allen notes that *Bennett* compares Arizona's matching funds provision to North Carolina's judicial public finance statute: "Maine and North Carolina have both passed matching funds statutes that resemble Arizona's law." *Bennett,* 131 S.Ct. at 2816, n. 3. By making this comparison, Deputy A.G. Allen argues that the Supreme Court was clearly aware of North Carolina's judicial public financing statute and chose not to distinguish it or carve out a judicial-election exception for the analysis it set forth in *Bennett.*

Deputy A.G. Allen next argues that the Supreme Court has explicitly rejected constitutional distinctions between judicial and non-judicial elections. For instance, in *Republican Party of Minnesota v. White,* 536 U.S. 765, 784, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), Justice Scalia's majority opinion, in rebutting Justice Ginsburg's dissent, stated:

> Justice GINSBURG greatly exaggerates the difference between judicial and legislative elections. She asserts that ... "unconstrained speech in elections for political office ... does not carry over to campaigns for the bench." ... It is not a true picture of the American system.

Furthermore, Justice Kennedy states in his concurring opinion in *White* that "[t]he State cannot opt for an elected judiciary and then assert that its democracy, in order to work as desired, compels the abridgement of speech." 536 U.S. at 795, 122 S.Ct. 2528 (Kennedy, J., concurring).

Additionally, Deputy A.G. Allen asserts that Petitioner Loughry's reliance on *Leake* and *Caperton* are misplaced. *Leake* was decided prior to *Davis* and *Bennett,* and Deputy A.G. Allen argues that a 2012 North Carolina federal case silently acknowledged that *Leake* is no longer good law. In *North Carolina Right to Life Political Action Committee v. Leake,* 872 F.Supp.2d 466, 2012 WL 1825829 (E.D.N.C.2012), the North Carolina matching funds statute was found to be unconstitutional based on the Supreme Court's ruling in *Bennett.* The Court stated that the "defendants offer no argument that the North Carolina matching funds statute is distinguishable from the Arizona law struck down in *Bennett* [.]" *Id.* at 473, 2012 WL 1825829 at *6.

Deputy A.G. Allen also maintains that *Caperton* provides no support to Petitioner Loughry's argument. *Caperton* held that a judge is required to recuse himself/herself "when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." 129 S.Ct. at 2263–64. The Supreme Court explained its *Caperton* holding in *Citizens United,* stating "[t]he remedy of recusal was based on a litigant's *due process right to a fair trial before an unbiased judge. Caperton's* holding was limited to the rule that the judge must be recused, *not that the litigant's political speech could be banned."* 130 S.Ct. at 910 (internal citation omitted, emphasis added). Deputy A.G. Allen argues that the *Caperton* holding is limited to the due process concerns it set forth—a litigant's right to receive a fair trial before an unbiased judge. *Caperton* does not deal with the First Amendment free speech concerns that are implicated by the matching funds at issue.[16]

---

**16.** Deputy A.G. Allen also asserts that the Legislature cannot attempt to remedy the due process

Finally, Deputy A.G. Allen argues that a number of Petitioner Loughry's arguments were recently rejected by the Supreme Court in *American Tradition Partnership, Inc. v. Bullock*, —— U.S. ——, 132 S.Ct. 2490, 183 L.Ed.2d 448 (2012). Deputy A.G. Allen provides a brief recitation of the Court's holding in *Bullock*, and the case underlying the *Bullock* decision, *Western Tradition Partnership v. Attorney General of the State of Montana*, 363 Mont. 220, 271 P.3d 1 (2011). Deputy A.G. Allen states:

> In the underlying case, the Montana Supreme Court had accepted every single argument that this Petitioner makes with respect to judicial elections, including what appears to be his primary argument, that *Caperton* somehow changes the *Citizens United/Bennett* landscape where judicial elections are involved. Additionally, the Montana Supreme Court had before it a well-developed historical record of actual corruption (some of it appearing to be quid pro quo) spanning a period of 100 years. Notwithstanding all this, the United States Supreme Court said simply:
>
> "Montana's arguments in support of the judgment below either were already rejected in *Citizens United*, or fail to meaningfully distinguish that case." 132 S.Ct. at 2491.

After reviewing both parties' arguments in light of the relevant rulings of the U.S. Supreme Court in First Amendment cases, we conclude that the Supreme Court's holding in *Bennett* applies to all elections to public office. The Supreme Court gave no indication in *Bennett* that judicial elections would be excepted from its holding. Nor are we persuaded that a majority of the U.S. Supreme Court is inclined to adopt a less rigorous standard than strict scrutiny to First Amend-

ment issues involving political speech in judicial elections. While we are sympathetic to Petitioner Loughry's position and agree with his assertion that judicial elections raise a number of compelling interests, we are bound to apply the Supreme Court's interpretation of the United States Constitution.[17] We find nothing in *Bennett*, nor in the relevant cases leading up to or decided after *Bennett* (*Davis, Caperton, Citizens United,* and *Bullock* ), that supports Petitioner Loughry's position that the Supreme Court has recognized or is inclined to find a judicial-election exception to its political speech jurisprudence generally or to its matching funds analysis specifically. As the Supreme Court explained in *Bennett:*

> [E]ven if the matching funds provision did result in more speech by publicly financed candidates and more speech in general, it would do so at the expense of impermissibly burdening (and thus reducing) the speech of privately financed candidates and independent expenditure groups. This sort of 'beggar thy neighbor' approach to free speech—'restrict[ing] the speech of some elements of our society in order to enhance the relative voice of others'—is 'wholly foreign to the First Amendment'.

131 S.Ct. at 2821 (citation omitted).[18]

Having determined that the Supreme Court did not recognize a judicial-election exception to its matching funds analysis in *Bennett,* and considering the similarities between Arizona's matching funds provisions and those set forth in our Pilot Program, *W.Va.Code* § 3–12–11(e)–(i), we conclude that the Pilot Program's matching funds provisions place a substantial burden on the privately financed candidates' First

concerns highlighted in *Caperton* by including matching funds in the Pilot Program that restrict a privately funded candidate's First Amendment political speech rights.

**17.** "In accordance with our federal system of government, our obligations here are to acknowledge that the Supreme Court's interpretation of the United States Constitution is, for better or worse, binding on this Court and on the officers of this state, and to apply the law faithful to the Supreme Court's ruling." *Western Tradition Partnership v. Attorney General of the State of*

*Montana,* 363 Mont. at 248, 271 P.3d at 18–19 (2011) (Nelson, J., dissenting).

**18.** We note that the four dissenting Justices (Justice Breyer, Justice Ginsburg, Justice Sotomayor and Justice Kagan) in *Bennett* strongly disagree with this analysis, "Arizona's statute does not impose a 'restriction' or 'substantial burde[n]' on expression. The law has quite the opposite effect: It subsidizes and so produces *more* political speech." 131 S.Ct. at 2833 (Kagan, J., dissenting) (internal citation omitted). These same four Justices likewise dissented in *Bullock.*

Amendment free speech rights. "Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United,* 130 S.Ct. at 898.

■ We must therefore apply a strict scrutiny analysis and determine whether the matching funds provisions contained in *W.Va. Code* § 3–12–11(e)–(i) further a compelling state interest, and are narrowly tailored to achieve that interest. The Legislature identified the interests the Pilot Program sought to achieve in the statute, stating the program was enacted to:

[E]nsure the fairness of democratic elections in this state, protect the Constitutional rights of voters and candidates from the detrimental effects of increasingly large amounts of money being raised and spent to influence the outcome of elections, protect the impartiality and integrity of the judiciary, and strengthen the public confidence in the judiciary[.]

*W.Va.Code* § 3–12–2(9).

Petitioner Loughry argues that these goals are "state interests of the very highest order." Petitioner Loughry cites a number of cases emphasizing the importance of these interests. For instance, in *Mistretta v. United States,* 488 U.S. 361, 407, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), the Supreme Court stated, "[t]he legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship." Similarly, in *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954), the Supreme Court stated that "justice must satisfy the appearance of justice" because without public faith in fair and unbiased courts, the judiciary cannot function. These interests were also highlighted by the Independent Commission on Judicial Reform. The Commission stated, "[a]s campaign expenditures rise, so too does the threat of bias, and certainly the public perception of bias, as candidates face mounting pressure to accept donations from lawyers and parties that may appear before them once they take a seat on the bench."

These interests, protecting the impartiality and integrity of the judiciary and strengthening public confidence in the judiciary, failed to sway the Supreme Court in *Bullock.* In the underlying case leading to *Bullock,* the Montana Supreme Court, in attempting to limit corporate spending in Montana elections and carve out an exception to *Citizens United,* stated:

Montana also has a compelling interest in protecting and preserving its system of elected judges ... The people of the State of Montana have a continuing and compelling interest in, and a constitutional right to, an independent, fair and impartial judiciary. The State has a concomitant interest in preserving the appearance of judicial propriety and independence so as to maintain the public's trust and confidence.

*Western Tradition Partnership,* 363 Mont. at 236–37, 271 P.3d at 12.

The Supreme Court summarily reversed *Western Tradition Partnership,* stating "[t]he question presented in this case is whether the holding of *Citizens United* applies to Montana state law. There can be no serious doubt that it does ... Montana's arguments in support of the judgment below either were already rejected in *Citizens United,* or fail to meaningfully distinguish that case." *Bullock,* 132 S.Ct. at 2491.

■ The Pilot Program's matching funds provisions cannot survive a strict scrutiny challenge because, even though they may address a compelling interest, they are not narrowly tailored. The Legislature had less restrictive remedies available to address the Pilot Program's goals that would not burden free speech. "[W]hen the Government seeks to regulate protected speech, the restriction must be the least restrictive means among available, effective alternatives." *U.S. v. Alvarez,* — U.S. ——, ——, 132 S.Ct. 2537, 2551, 183 L.Ed.2d 574 (2012) (internal citation omitted). The Legislature could have increased the amount of the initial disbursement to publicly financed candidates. This would have removed the need for government matching funds triggered by privately financed candidates' spending. In *Bennett,* the Supreme Court stated that:

It is not the amount of funding that the State provides to publicly financed candidates that is constitutionally problematic in this case. It is the manner in which the funding is provided—in direct response to the political speech of privately financed candidates and independent expenditure groups.

131 S.Ct. at 2824.[19]

Moreover, the matching funds provisions of the Pilot Program do not accomplish the Legislature's goal of protecting the impartiality and integrity of the judiciary, and strengthening the public confidence in the judiciary. In the current election, with three of the four candidates being privately financed, providing matching funds to one publicly financed candidate does not ameliorate the "detrimental effects of increasingly large amounts of money being raised and spent to influence the outcome of elections." W.Va.Code § 3–12–2(9). The matching funds do not eliminate the appearance that the three candidates who accept campaign contributions may be biased or partial toward their contributors. As the Independent Judicial Commission observed, "[a]s campaign expenditures rise, so too does the threat of bias, and certainly the public perception of bias, as candidates face mounting pressure to accept donations from lawyers and parties that may appear before them once they take a seat on the bench." The government matching funds serve no other purpose than "leveling the playing field" between the one publicly funded candidate and the three privately financed candidates.

The Supreme Court has repeatedly rejected the argument that "the government has a compelling state interest in 'leveling the playing field' that can justify burdens on political speech." Bennett, 131 S.Ct. at 2825. The Supreme Court, relying on Davis v. Federal Election Commission, explained in Bennett that:

"Leveling the playing field" can sound like a good thing. But in a democracy, campaigning for office is not a game. It is

a critically important form of speech. The First Amendment embodies our choice as a Nation that, when it comes to such speech, the guiding principle is freedom—the "unfettered interchange of ideas"—not whatever the State may view as fair.

Id. at 2826, quoting Buckley v. Valeo, 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

■ After considering the parties' arguments, we conclude that the matching funds provisions, W.Va.Code § 3–12–11(e)–(i) [2010], set forth in the West Virginia Supreme Court of Appeals Public Campaign Financing Pilot Program are unconstitutional because they place a substantial burden on privately financed candidates' free speech rights in violation of the First Amendment to the United States Constitution. The Pilot Program's goals—protecting the impartiality and integrity of the judiciary, and strengthening public confidence in the judiciary—are compelling state interests. Nevertheless, the matching funds provisions contained in the Pilot Program must be narrowly tailored to ensure that they do not infringe on privately financed candidates' First Amendment political speech rights. The matching funds provisions are not narrowly tailored and place a substantial burden on the unfettered political speech of the privately financed candidates. As a result, the matching funds provisions cannot withstand a strict scrutiny challenge under the United States Constitution based upon Arizona Free Enterprise Club's Freedom Club PAC v. Bennett, —— U.S. ——, 131 S.Ct. 2806, 180 L.Ed.2d 664 (2011), and American Tradition Partnership, Inc. v. Bullock, —— U.S. ——, 132 S.Ct. 2490, 183 L.Ed.2d 448 (2012).

■ Having determined that the matching funds provisions contained in W.Va.Code § 3–12–11(e)–(i) are unconstitutional, we must now consider principles of severability in order to decide whether the entire statute, or merely the matching funds provisions of

19. Deputy A.G. Allen argues that another less restrictive alternative would be for the Legislature to adopt more rigorous recusal standards for judges. However, W.Va. Const. Art III, § 3, 8, provides that administrative and procedural

rules of West Virginia courts are the sole province of the West Virginia Supreme Court of Appeals. The Legislature has no constitutional authority to enact recusal standards. See, Bennett v. Warner, 179 W.Va. 742, 372 S.E.2d 920 (1988).

the statute, must be declared unconstitutional. We note at the outset that *West Virginia Code* § 3–12–1 *et seq.*, does not contain an express severability clause.

However, the Legislature has set forth the following general rule with respect to severability:

> Unless there is a provision in a section, article or chapter of this code specifying that the provisions thereof shall not be severable, the provisions of every section, article or chapter of this code, whether enacted before or subsequent to the effective date of this subdivision, shall be severable so that if any provision of any such section, article or chapter is held to be unconstitutional or void, the remaining provisions of such section, article or chapter shall remain valid, unless the court finds the valid provisions are so essentially and inseparably connected with, and so dependent upon, the unconstitutional or void provision that the court cannot presume the Legislature would have enacted the remaining valid provisions without the unconstitutional or void one, or unless the court finds the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent[.]

*W.Va.Code* § 2–2–10(cc) [1998], in relevant part.

■■■ Similarly, this Court has stated:

> A statute may contain constitutional and unconstitutional provisions which may be perfectly distinct and separable so that some may stand and the others will fall; and if, when the unconstitutional portion of the statute is rejected, the remaining portion reflects the legislative will, is complete in itself, is capable of being executed independently of the rejected portion, and in all other respects is valid, such remaining portion will be upheld and sustained.

Syllabus Point 6, *State v. Heston*, 137 W.Va. 375, 71 S.E.2d 481 (1952).[20] This analysis is proper even in the absence of a statutory severability clause. "The principle is well settled by many decisions of this Court that a

statute ... may contain both constitutional and unconstitutional provisions which in substance are distinct and separable so that some may stand though others must fall. *And this is true whether or not the statute in question contains a separability clause.*" *State ex rel. State Bldg. Comm'n v. Bailey*, 151 W.Va. 79, 93, 150 S.E.2d 449, 457 (1966) (emphasis added). We also note that:

> [t]he most critical aspect of severability analysis involves the degree of dependency of statutes. Thus 'where the valid and the invalid provisions of a statute are so connected and interdependent in subject matter, meaning, or purpose as to preclude the belief, presumption or conclusion that the Legislature would have passed the one without the other, the whole statute will be declared invalid.' Syl. pt. 9, *Robertson v. Hatcher*, 148 W.Va. 239, 135 S.E.2d 675 (1964).

*Louk v. Cormier*, 218 W.Va. 81, 97, 622 S.E.2d 788, 804 (2005).

Mindful of these principles of statutory severability, we find that the removal of the matching funds provisions *does not defeat the purpose of W.Va.Code* § 3–12–1 *et seq.* The only portion of the statute that is void and unconstitutional are the matching funds provisions set forth in *W.Va.Code* § 3–12–11(e)–(i). Aside from the matching funds provisions, the remainder of *W.Va.Code* § 3–12–1 *et seq.*, is complete in itself, capable of being executed independently of the rejected portion, and valid in all other aspects unrelated to the matching funds.

■■■ Lastly, we address whether Petitioner Loughry can retain the initial funds he received from the Pilot Program, and whether he may now solicit campaign contributions in light of our ruling. Petitioner Loughry received an initial disbursement of $350,000 under the constitutionally sound portion of the Pilot Program. The U.S. Supreme Court has clearly stated that this type of public financing is constitutionally sound. *See Buckley v. Valeo*, 424 U.S. 1, 57, n. 65, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). There is no constitutional problem with West Virginia

---

**20.** *Accord Louk v. Cormier*, 218 W.Va. 81, 96–97, 622 S.E.2d 788, 803–804 (2005); Syllabus Point 3, *Frantz v. Palmer*, 211 W.Va. 188, 564 S.E.2d 398 (2001).

providing a fixed contribution amount to publicly financed candidates. However, political speech rights are violated when West Virginia provides matching funds to publicly financed candidates based on the amount spent by privately financed candidates. *See, Bennett,* 131 S.Ct. at 2824. We therefore find that Petitioner Loughry may retain the $350,000 initial disbursement made under the Pilot Program.

*West Virginia Code* § 3–12–12 prohibits a participating candidate from raising private contributions. Nevertheless, Petitioner Loughry, acting in good faith, detrimentally relied upon and complied with all of the statutory requirements set forth in the Pilot Program but is now precluded from obtaining part of the funds promised under the statute because we have determined the matching funds provisions to be unconstitutional based on the U.S. Supreme Court's interpretation of the United States Constitution in *Davis, Citizens United, Bennett,* and *Bullock.* This case presents a unique set of circumstances—a publicly financed candidate has detrimentally relied on matching funds provisions that are found to be unconstitutional two months before the election. Considering these unique circumstances and as a matter of fundamental fairness to Petitioner Loughry, who relied in good faith on the terms of the Pilot Program, we find that Petitioner Loughry may now seek campaign contributions in support of his candidacy.

### IV. Conclusion

Based on all of the foregoing, Petitioner Loughry has failed to establish a clear legal right to the relief sought. The Petition seeking a writ of mandamus is therefore denied. The Clerk of this Court is ordered to enter the mandate immediately.

Writ denied.

Judge WILKES concurs and reserves the right to file a concurring opinion.

Justice BENJAMIN, deeming himself disqualified, did not participate.

Justice DAVIS, deeming herself disqualified, did not participate.

Justice WORKMAN, deeming herself disqualified, did not participate.

Judge MARKS, sitting by temporary assignment.

Judge MAZZONE, sitting by temporary assignment.

Judge WILKES, sitting by temporary assignment.

WILKES, Judge (sitting by temporary assignment), concurring.

I concur in the majority's conclusion that the matching funds provision is unconstitutional, and therefore concur with the denial of mandamus. However, I only reluctantly agree with the use of strict scrutiny in the context of judicial elections, where First Amendment free speech will often necessarily be opposed to maintenance of an independent, unbiased judiciary.[1] Therefore, I write separately only to note two points: first, to explain how judicial elections are notably different than other, policy-based elections; and second, to briefly expand upon how this law fails to be narrowly tailored.

The majority notes that it is sympathetic with and agrees that judicial elections raise a number of compelling interests. *See,* 229 W.Va. at 639, 732 S.E.2d at 516. I agree with this view, and believe it needs further elaboration—judicial elections, as opposed to elections for legislative or executive offices, are notably different.

An independent, impartial, and unbiased judiciary is inherent to the provisions of Article III of the United States Constitution and Article VIII of the West Virginia Constitution. The Due Process requirements of the respective Constitutions, even more so, inherently require an independent, unbiased

---

1. "Whether we agree with the Supreme Court's interpretation of the First Amendment is irrelevant. In accordance with our federal system of government, our obligations here are to acknowledge that the Supreme Court's interpretation of the United States Constitution is, for better or for worse, binding on this Court and on the officers of this state, and to apply the law faithful to the Supreme Court's ruling." *Western Tradition Partnership v. Attorney General of the State of Montana,* 363 Mont. 220, 271 P.3d 1 (2011) (Nelson, J., dissenting).

judiciary. *See, e.g.*, U.S. Constitution, Art. 5 and Amend. 14; W.Va. Constitution Art. 3, Sect. 10. As noted by the majority, the very legitimacy of the judicial branch of government "ultimately depends on its reputation for impartiality and nonpartisanship." *Mistretta v. United States*, 488 U.S. 361, 407, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). Truly, an independent, unbiased judiciary is part of, and paramount to the success of, our general system of government.[2]

The Supreme Court in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009), recognized the inescapable truth that elections of judicial officers present a different set of competing important interests than elections of executives or legislators. The Supreme Court even noted, that "[a]lmost every State—West Virginia included—has adopted the American Bar Association's objective standard: 'A judge shall avoid impropriety and the appearance of impropriety,'" and that these "codes of conduct serve to maintain the integrity of the judiciary and the rule of law." *Id.* at 887, 129 S.Ct. 2252. The Supreme Court recognized that these codes, *which often represent restriction upon speech,* "serve to maintain the integrity of the judiciary and the rule of law" and further that they are "the principal safeguard against judicial campaign abuses that threaten to imperil public confidence in the fairness and integrity of the nation's elected judges." *Id.* at 889, 129 S.Ct. 2252 (internal quotations and citations omitted). In fact, even the dissent in *Caperton* (written by Chief Justice Roberts and joined in by Justices Scalia, Thomas, and Alito) shared "the majority's sincere concerns about the need to maintain

a fair, independent, and impartial judiciary—and one that appears to be such."[3]

Also, the Supreme Court in *Republican Party of Minnesota v. White,* recognized these different interests and stated that the majority "neither assert[s] nor imply[s] that the First Amendment requires campaigns for judicial office to sound the same as those for legislative office."[4] 536 U.S. 765, 783, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002).

Further, I find it clear that this constitutionally based interest is not present in legislative and executive elections, as those are policy-based elections. Most elections require a candidate to state what he or she will do while in office. In this way, a candidate is espousing his or her policy beliefs, and the electorate is choosing him or her based, at least in part, upon what policy they think is best. A candidate's conduct in a judicial election is, and must be, different. A judicial candidate is, in many ways, proscribed from stating what he will do when in office.[5] These proscriptions, in themselves are a recognition of the need for an independent, unbiased judiciary. Moreover, they display the quite different and important interests at play in a judicial election as opposed to policy elections for a legislative or executive office.

When there are judicial elections, it is unavoidable that First Amendment free speech will necessarily be opposed to at least the perception of independent, impartial, and unbiased judiciary. This truth is recognized by the Supreme Court in *Caperton* and *White.* 556 U.S. 868, 129 S.Ct. 2252, 536 U.S. 765, 122 S.Ct. 2528. With these underlying constitutional values at play as well as the other accepted speech restrictions in our system which protect the judiciary against partiality,

**2.** Petitioner Loughry, persuasively *cites* a number of authorities supporting his position on the importance of an unbiased and independent judiciary.

**3.** The dissent noted that they dissented due to a *"fear that the Court's decision will undermine* rather than promote these values." Justice Scalia also wrote a dissenting opinion.

**4.** Yet, the Supreme Court in *White,* in a similar situation, applied strict scrutiny. 536 U.S. at 774–75, 122 S.Ct. 2528; *see also,* discussion, *infra.*

**5.** Cannon 4 of the ABA Model code of Judicial Conduct provides, "A judge or candidate for judicial office shall not engage in political or campaign activity that is inconsistent with the, integrity, or impartiality of the judiciary." There are various other restrictions which could act to abridge the speech of judicial candidates and others surrounding the election of judges found in these types of Codes. *See, e.g.,* ABA Model Code of Judicial Conduct, Cannons 1, 3; and W.Va.Code of Judicial Conduct, Cannons 1, 2, 4, 5.

bias, and corruption, it appears that the highest level of scrutiny (strict scrutiny) would act to invalidate several of these necessary restrictions. In this context, a slightly lower level of scrutiny would appropriately give deference to this other constitutionally-based interest.

Yet, the Supreme Court in *White* did apply strict scrutiny and noted that the dissent "greatly exaggerates the difference between judicial and legislative elections." 536 U.S. at 784, 122 S.Ct. 2528. In light of all the other relevant authorities cited by the parties and *amici*, especially including *Davis v. Federal Election Comm'n*, 554 U.S. 724, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008), and *Arizona Free Enterprise Club's PAC v. Bennett*, — U.S. ——, 131 S.Ct. 2806, 180 L.Ed.2d 664 (2011), I cannot find that the Supreme Court intends anything but strict scrutiny to apply to this type of law (as opposed to this situation).[6] Because my interpretation is not controlling when the Supreme Court has made its intentions clear, I must faithfully apply the Supreme Court's interpretation. *Western Tradition Partnership*, 363 Mont. at 248, 271 P.3d 1. Therefore, I must concur with the majority's application of strict scrutiny.[7]

Nonetheless, the matching funds provision fails to pass any of the First Amendment free speech scrutiny. I reach this conclusion for the same reasons that the majority finds it not to be narrowly tailored, but again find

further explanation appropriate. *See,* 229 W.Va. at 641, 732 S.E.2d at 518.

While the stated interest of this law is clearly compelling, I find it impossible for the matching funds provision to be narrowly tailored. For example, the prejudice which a self-financed judicial candidate faces under this provision displays this provision's over-inclusiveness and demonstrates lack of tailoring. This provision prejudices self-financed judicial candidates by directly restricting expenditures regardless of whether any contributions are made.[8] Yet, self-financed judicial candidates do not cause concern for their bias like those funded by third parties, who are possibly future litigants. A self-financed candidate would appear equally as independent and unbiased as a publicly financed or wholly unfinanced candidate. Nevertheless, this law would abridge the speech of a self-financed candidate because his or her speech-related expenditures would trigger a publicly financed candidate's matching funds for speech. *See, Bennett,* 131 S.Ct. 2806. A self-financed candidate must bear that his or her speech, by way of campaign expenditures, triggers his or her opponent's receipt of public monies, possibly giving the opponent the last word. This significant example displays how the matching funds provision is too broad. As noted by the majority, this matching funds provision does nothing more than level the playing field between publicly funded candidates and privately funded ones. *See,* 229 W.Va. at 641, 732 S.E.2d at 518. As much as some may find this leveling appeal-

---

**6.** As opposed to other slightly lower levels of scrutiny such as "exacting scrutiny," *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), or "closely drawn" scrutiny, *McConnell v. Federal Election Com'n,* 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (overruled by *Citizens United,* 130 S.Ct. 876), which the Court has applied to First Amendment free speech issues in a "less onerous" situation. *Bennett,* 131 S.Ct. at 2817.

**7.** I do note that the majority's reliance upon that *American Tradition Partnership, Inc. v. Bullock,* — U.S. ——, 132 S.Ct. 2490, 183 L.Ed.2d 448 (2012), (and its underlying case, *Western Tradition Partnership v. Attorney General of the State of Montana,* 363 Mont. 220, 271 P.3d 1 (2011)), to support the conclusion that the Supreme Court would apply reject a different approach in judicial elections is misplaced. *Bullock* was a case about a law generally prohibiting a corporation

from making any expenditures or contributions that supported or opposed a candidate in any type of election which applied criminal penalties, and about how *Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) invalidated the law. I find that situation notably different to this matter, even if the Supreme Court of Montana briefly discussed its application in the context of judicial elections.

**8.** In *Buckley v. Valeo,* the Supreme Court also found expenditure limitations, as opposed to contribution limitations, generally more directly abridging to the freedom speech, and therefore did warrant strict scrutiny. 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). *See also, Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). Yet, again, these were not in the context of judicial elections. See discussion *supra.*

ing, it is too broadly drawn, having too much of an effect upon free speech to be considered narrowly tailored, or closely drawn, or not unfairly burdensome. *See, e.g., Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("exacting scrutiny"); *McConnell v. Federal Election Com'n,* 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) ("closely drawn" scrutiny) (overruled by *Citizens United,* 130 S.Ct. 876). Therefore, I opine that the provision, while recognizing the compelling government interests of an unbiased and independent judiciary, creates an unnecessary and impermissible abridgment of free speech. Thus, this matching funds provision violates the free speech clause of the First Amendment of the United States Constitution.

By this conclusion, I find that the elements for mandamus cannot be met, Syllabus Point 2, *State ex rel. Kucera v. City of Wheeling,* 153 W.Va. 538, 170 S.E.2d 367 (1969). I also find the majority's conclusions regarding severability and that Petitioner Loughry may now solicit campaign contributions correct. Therefore, I respectfully concur with the majority's opinion in this case.